Head *vs.* Head.

| | | |
|---|---|---|
| 2 | 191 |
| 118 | 87 |
| o118 | 184 |
| o118 | 185 |

No. 27.—BEDFORD HEAD, plaintiff in error *vs.* AMANDA F. M. HEAD, defendant in error.

| 2 | 191 |
|---|---|
| f130 | 684 |

[1.] The only causes for total divorce in Georgia are those recognised by the common law, to wit, pre-contract, consanguinity, affinity, and corporeal infirmity.

[2.] And the only causes recognised in Georgia for a partial divorce are those of the common law, to wit, adultery and cruel treatment.

*Divorce.* From Monroe Superior Court. Tried before Judge FLOYD. September Term, 1846.

Ground. *Abandonment* by the wife. For the judgment of the Court below, and the error assigned, see the opinion of the Supreme Court.

ANGUS M. D. KING, for the plaintiff in error.

No appearance on the part of the defendant.

*By the Court*—NISBET, J. delivering the opinion.

This was an application by the husband for a divorce, *a vinculo matrimonii*, upon the single ground that his wife had abandoned him. She would not live with him, and that was all he had to allege against her. The Court below decided that abandonment by the wife was not a good cause for divorce, either *a vinculo matrimonii* or *a mensa et thoro.* To this opinion the libellant excepted.

We might, perhaps, have determined this question, affirm- [1.] ing or disaffirming the judgment, without giving any opinion as to what constitutes good cause for divorce generally in this State, but for the fact that the plaintiff in error rested his claim to a divorce in this case upon a construction of our constitution and laws, which necessarily exacts an opinion. He, through his learned counsel, contends that, according to a fair construction of the constitution of Georgia, and of the laws enacted to carry it into effect, the question of divorce or not, in its totality, is submitted to the special juries; that they are the sole and final judges in all cases of what shall be a good cause of divorce, irrespective of the common law principles, which, when we adopted it, governed divorces in England. This position was indispensable to him, because, by the common law, it is too plain to admit of question, that abandonment

by the wife is not recognised as cause of divorce *a vinculo.* The burdensome responsibility is, therefore, thrown upon this Court of determining what are the relative powers of the court and jury in divorce causes, and what are the *legal principles* mentioned in the constitution, and also in the acts of the Legislature, upon which they are to depend. It is matter of sincere regret that this cause, being presented *ex parte,* we had not the benefit of argument on both sides. The questions are of vital interest to the people of this State. There are no questions which, in my view, with a more searching and serious power, pervade the moral, social, and political interests of the State. The judgment we have given in this case is in repeal of the practice of the courts in a majority of the circuits, and in disaffirmance of the opinion of eminent jurists upon the bench and at the bar, and in conflict with that public sentiment which, springing out of, and strengthened by, the heretofore judicial facility which has characterized the action of the courts, tolerates and expects divorces for slight causes. And, *therefore,* we cannot fail to feel the responsibility of our position with more than ordinary intensity. A violent change in judicial administration naturally tends to shock the feelings of the community. Greatly would we have preferred that the Legislature had declared the law of divorce. They have not declared it. This tribunal, organized for the very purpose of giving a uniform and permanent construction to our constitution and laws, would be recreant to its solemn duties could it turn aside from any question submitted to it. It meets this cheerfully, having no doubt that we are right in the conclusions to which we have arrived, and having no fears but that the judgment of the profession, and of good and enlightened men of all classes, will approve them.

Prior to the Constitution of 1798, we find no legislation upon the subject of divorces. Before that time, the Legislature possessed, and we know did exercise, the power of granting divorces; the same power which the Parliament or Great Britain exercised, a power having no limit, and recognising no restraint but the will of the body. Each divorce granted by our Legislature, intervening the organization of the State Government, and the constitution of 1798, *pro tanto* repealed the common law. But we find no constitutional or legislative declaration of any kind on our statute books until the adoption of the Constitution of 1798. We shall advert again to the state of the divorce law, as it stood intervening the organization of our State Government, and the Constitution

Head *vs.* Head.

of 1798. For the present, with a view to the history of the subject, we affirm that, if there was any action by convention or legislation declaring the law of divorce prior to that period, it has eluded our search. The Constitution of 1798 declares as follows: "Divorces shall not be granted by the Legislature until the parties shall have had a fair trial before the Superior Court, and a verdict shall have been obtained authorizing a divorce upon *legal principles;* and, in such case, two-thirds of each branch of the Legislature may pass acts accordingly."

In 1802, four years after the adoption of the Constitution, the Legislature passed an act entitled, "An act to carry into effect the ninth section of the third article of the constitution," viz. the section above quoted. This act prescribes the manner of commencing suit for a divorce, of defending against it, the form of the verdict, and some other unimportant details, but does not attempt the declaration of any legal principles touching the causes for divorce. In 1806, an act was passed amendatory of the act of 1802, prescribing the mode further of prosecuting libels, declaring that divorces should be absolute and partial; making provision out of the husband's estate for the wife and children in case of a partial divorce; prohibiting the offending party from marrying during the life of the other party; requiring a schedule of property to be filed, and disposing of the property in cases of absolute divorce, &c. &c. In this act we look in vain for any declaration of principles. The only further general act relative to this subject was passed in 1810, simply prescribing the oath of the jury in divorce cases. For all of these acts see *Prince,* 187, 188, 189, 190. In 1835 the Constitution of 1798 was amended, and in lieu of the 9th section of the 3d article, before quoted, the following became the Constitution of the State, so far as divorces are concerned, to wit: " Divorces shall be final and conclusive when the parties shall have obtained the concurrent verdicts of two special juries, authorizing a divorce upon *legal principles.*" *Prince,* 911. Such is the Constitution at this day, and such is a brief history of the action of the people of this State on the subject of divorces.

We have now arrived at the consideration of the meaning and effect of the Constitution of 1798. In our judgment the Constitution of 1798 was intended, 1st, to transfer the jurisdiction over divorces in all cases in *the first instance,* from the Legislature to the Superior Courts; for it provides, "that divorces *shall not* be granted by the Legislature, *until* the parties shall have had a fair

trial before the Superior Court, and a verdict shall have been obtained authorizing a divorce." Before 1798 the Legislature had unlimited power over the subject, and we infer that, whether the courts *possessed* jurisdiction or not they did not *exercise* it. By the Constitution the initiatory steps towards getting a divorce were to be taken before the courts; the right and the duty of *first* hearing the cause were devolved upon them, and the Legislature was inhibited from *acting at all until* there was *a trial and verdict* before the Superior Court.

2. By the terms of the Constitution, the legislative will was intended to be restrained in its action, upon such divorce causes as thus came to it from the courts, by the requirement, that there should be a vote of two-thirds of each branch before there could be a dissolution of the marriage contract. That is to say, the fair trial and verdict being had, it was competent, (and yet not obligatory,) for the Legislature to grant divorces, provided there was in favour of the application a concurring vote of two-thirds of both branches.

3. The Constitution intended to restrict both the courts and the Legislature, as to their power to grant divorces, to such cases as were grantable upon *legal principles.* For the Legislature is clothed with power to act *only,* when there has been in the cases brought before it, a *fair trial* and a verdict rendered upon *legal principles.* The Constitution declares that the trial shall be had, and the verdict rendered, upon *legal principles,* and before *the Superior Court;* thus making that court the judge of the application of those principles to the cases brought before it. I only remark, in this stage of this discussion, that it must be apparent to the most careless reader, that the Constitution of 1798 is in restraint of divorces; the wise framers of that instrument were careful to hinder facility in their procurement. The prohibitory and restraining character of the article, the fact that these restraints are fundamental, and beyond the reach of legislative caprice or impulse, go a great way to disprove and negative the inferences which the counsel draws in favour of his construction. The amended Constitution of 1785, in a few brief words, divests the Legislature of all jurisdiction over divorces, and casts it entire upon the courts; by the fundamental law it belongs now to them, and cannot belong elsewhere. At this point we feel authorized in saying, not only that the Legislature has no power to grant divorces, but, until the Constitution is amended, has no power to say upon what principles they shall be

Head *vs.* Head.

granted by the courts. For the Constitution of 1835 not only vests the whole jurisdiction over divorces in the courts, but ordains the *principles* upon which they shall be granted. The language of the amendment of 1835 is peculiar. "Divorces shall be final and conclusive, &c.;" there is no formal investing of the court with the jurisdiction, but it is conferred obliquely. The Superior Court can alone impanel a special jury, and divorces are final and conclusive only when there are two concurring verdicts of *special juries;* the Superior Courts can alone, therefore, try them. The Constitution ordains that divorces shall be final and conclusive upon there being two concurring verdicts; we infer, necessarily therefore, that no divorce obtained otherwise will be final and conclusive. *Ex pressio unius est exclusio alterius.* And if, as we have stated, and expect to show, the Constitution has also ordained the principles of law upon which they can alone be granted, then the Legislature has no power, until the Constitution is amended, to establish any other principles upon which to grant them. The most material thing to be noted in the Constitution of 1835, is this; the restraint upon the granting of divorces, which by the Constitution of 1798 limited both the courts and the Legislature to the power to grant them upon *legal principles,* is preserved in it. No construction which can be given to the Constitution will make a divorce final and conclusive which is not granted upon *legal principles.*

It is scarcely necessary to inquire into the reasons which induced the Legislature to divest themselves of all power over this subject. The preamble to the act amendatory of the Constitution recites some of the reasons; such as the *annoyance* of the Legislature by reason of the *frequent, numerous* and *repeated applications* for divorces; the *expense* attending on these applications, and the unnecessary *swelling the laws and journals, &c.* Now, the reasons of a law, which are put forth in a preamble to meet the public eye, are not always the only, or the true reasons—they are not in this case; the amendment of 1835 had its origin, I have no doubt, in a conviction upon the minds of prudent and discerning men, that divorces under the Constitution of 1798 were alarmingly frequent; that this was owing to the fact, that the responsibility being divided between the Courts and the Legislature, was felt by neither; and that if the responsibility of finding the facts was cast upon special juries, and of administering the law upon the courts, divorces would be of rare occurrence, and society be saved from a

legalised process of demoralization. Under the old system, the courts but rarely seem to have felt, that they had any thing to do with the trial of a divorce cause, other than to subserve the humble purpose of an automaton agent in the hands of lawyers to present their cases to the juries. Believing that the Legislature, whether for good or evil, had made the juries the sole arbiters of the law and the facts, they could of course feel no responsibility about the matter, and the consequence was, as all men know who know any thing of our courts of justice, that divorces were had with flagrant facility; that some were refused which ought to have been allowed, and hundreds were granted which ought to have been refused; and that the event of a divorce cause depended more upon the fact whether it was defended or not, and if defended, upon the zeal and ability of counsel, than upon any thing else. Nor was the case essentially different when it came before the Legislature. The Legislature, taking it for granted that the courts had settled all the *legal principles* involved in the majority of cases, with ready acquiescence affirmed the judgment of the court and divorced the parties. The wealth and standing of parties, their political and social relations, or, perhaps, the personal beauty and address of a female libellant, controlled, in many cases, the action of the Legislature. As proof that this picture is truthful, take the facts stated by Mr. Prince. Two hundred and ninety-one persons were divorced in Georgia from 1798 to 1835, a period of thirty-seven years, averaging from 1800 to 1810, four per annum; from 1810 to 1820, eight; from 1820 to 1830, eighteen, and from 1830 to 1835, twenty-eight. How fearful was the ratio of increase! Well might the patriot, the Christian, and the moralist, look about him for some device to stay this swelling tide of demoralization. The facts stated prove one of two things incontestably, either that I am right and divorces were granted for any and all causes, or society in Georgia was deplorably rude and licentious. The latter cannot be, for take the mass of the population of the two States, and society in Georgia, during that period, was as refined and as moral as in South Carolina, where, to her unfading honour, a divorce has not been granted since the revolution. To remedy a state of things so discreditable to the State, and so alarming to the security of every social interest, the amendment of 1835, I think, was passed. But it is said that the new mode of granting divorces has not remedied the evil; that divorces are as frequent under the new as under the old Constitution. This is, we admit, to a great extent true, and the

reason is obvious. It is owing to a wrong construction of the Constitution—to that construction which has been contended for before this Court—to a construction yielded to for the most part by the courts, which, discarding all legal principles, submits the whole question to the juries. Under this construction the right of being divorced has been subjected to no legal tests, the matrimonial contract has been hedged in by no rules of law; the juries, without landmarks to guide them, have been clothed with plenary powers; have been subrogated to the omnipotence of the British Parliament, or of the Legislature, before the Constitution of 1798. This construction is, in our humble opinion, wrong; we think that the Legislature, in the Constitution of 1835, intended to confine divorces to causes ascertained by the law, of force when it was adopted; that the judges in this, as in all other civil causes, should pronounce the law; and that the juries should, under the law as administered to them, by their verdicts find the facts. By the words of the Constitution divorces are to be final, when two concurring verdicts are rendered upon *legal principles.* It is not to be doubted but that it was intended that *legal principles* should control the verdicts. Who, then, is to judge of these principles? Is it fair to infer, from general words, a power in the jury which they do not possess in any other analagous cases? is it fair to infer it, in direct opposition to the object and interest of having a Judge at all? that object and interest, in all civilized communities, being to administer the law—is it fair to infer it, in the teeth of every element which constitutes our judicial organization? is it reasonable, by implication, to invest the jury with a power which is foreign to the object and end of impaneling a jury at all? that object and end, in all civil cases, being to pass upon and find the facts— is it reasonable to presume that the Legislature intended to make the highest judicial functionary then known to the Constitution, the unthinking, irresponsible conduit, by which facts were to be communicated to the jury? or that the imposing array of the court should become the convenient machinery for recording the verdicts of its juries? Pitiful, indeed, are learned and salaried judges, if they are made to subserve such an end, and no more. Either the juries are made the sole judges of the expediency of granting a divorce in every case, without law, or else the judges, as in other cases, must administer the law; for by no canon of construction that I have seen or heard of, can judicial functions be inferred from a general authority, to a jury to find a verdict. We conclude that

the juries were not clothed with a discretion to grant divorces without law, from the *unreasonableness and impolicy of such a grant, and because in no civilized country is there a precedent for it.* We know of no jury, commission, board, or body corporate, in any of the States of Europe or America, clothed with a power to grant divorces *ad libitum.* Even the sovereign omnipotence of the British Parliament, in this regard, is, by its own concession, veiled by certain time-honoured usages. For example, according to the usages of Parliament, it will not grant a divorce *a vinculo* for adultery, until the applicant has been divorced by the Eclesiastical Courts *a mensa,* and until evidence is furnished that he has sued the seducer for damages and obtained judgment, or sufficient reasons are given why such suit was not instituted and judgment obtained. See note to 1 *Chit. Black. t. p.* 355.

And although, in France, divorces by the Napoleon Code may be granted without cause, upon mutual consent merely, yet the application must be made to a judicial tribunal, and the consent is subjected to constraints, which create great and serious checks upon its abuse. *See Code Napoleon, No.* 233, 275 *to* 297.

Marriage is a civil contract. In what civilized region of the globe are the rights of parties to a contract submitted to the *discretion* of a jury? where are not contracts protected by law? In England, in France, in America, at Rome, at Athens, the genius and learning of man have been tasked to the utmost to subject contracts to strict and specific legal rule; and why should the marriage contract be an exception? why should that be outlawed, and the rights of husband and wife, parent and child, in vitally important particulars, be set afloat upon the tumultuous ocean of popular discretion? Do we, living in the light of the highest civilization, in the land of bibles, domestic homes, and every social charity, and beneath institutions both free and benignant, do we esteem less reverently, and regard with less sanctity, the marriage contract than did our fathers of an earlier and darker age? than did those States who knew not either God or liberty? In my view of this subject, the *Family is the foundation of the State.* Upon the intangible sanctity, and almost indissoluble integrity of the marriage contract, depend the character and happiness of our population, the perpetuity of our institutions, the peace of our homes, and all the charities of social life. If any thing ought to be under the protection of the law, surely this contract ought to be. The happiness of married life depends very much upon the idea of the

indissoluble character of the relation, and I am well assured that legal facility in dissolving it is the source of strife, bickering, crime and misery. The men of 1835, therefore, I conclude, did not, because of the unreasonableness, absurdity and unprecedented character of the thing, intend to confer upon the juries a perfect discretionary power over this subject. Such a grant of power would be in harmony with the lax morality, the polygamy and political despotism, of oriental paganism, rather than the intelligence, virtue and religion of Georgia. It has been urged that our special juries are a safe depository of such a power, on account of their virtue and intelligence. We admit, with pride and pleasure, the virtue and intelligence of this most valuable class of the people, yet we reply they are men, uneducated in the law, liable to err, susceptible of impulse, of passion and of prejudice, and therefore not to be charged with a discretion, which we venture to say, in no analogous case, belongs to any department, or all the departments, of the government. The same power was claimed for the jury under the Constitution of 1798, in the interlocutory action of the court upon divorce cases; and a legislative construction of that constitution, as to the duty of the jury, is found in the act of 1802, which defines the verdict. That act declares, that the verdict shall be in the words following, to wit : " We find that sufficient *proofs* have been referred to our consideration to authorize a total divorce, that is to say a divorce *a vinculo matrimonii*, upon legal principles, between the parties in this case." The inference to be drawn from the form of this verdict is, that divorce causes were to be tried upon legal principles, and that what was referred to the jury were the *proofs*, and nothing else. What does the verdict find? why that *sufficient proofs* have been *submitted* to the jury to authorize the divorce; that is, to paraphrase the verdict, it means this, "we, the jury, find, according to the law given to us in charge, that the facts are sufficiently proven to authorize the divorce." Upon any view of the Constitution of 1798, or of that of 1835, we can come to no conclusion but this, that the law was referred to the court and the facts to the jury.

The inquiry to which we now address ourselves is, *what are the legal principles referred to in the constitution, upon which divorces are to be granted?* We think the legal principles referred to are those principles of law, upon the subject of divorces, which were of force in 1798, when the old Constitution was adopted. Whatever they were in 1798 they were the same in 1835, for between those

two periods there was no legislation declaring the law of divorce. Indeed, if there had been, such legislation, if in conflict with the law as of force in 1798, would have been unconstitutional; because, as we hold, the Constitution adopted, and made part and parcel of itself, of that law, whatever it was. In the provision that divorces should not be granted but upon *legal principles*, the framers of the constitution could not have contemplated the law of France, or of Spain, or of South Carolina, or any other country, but the law of that State for which the constitution was designed; nor could they have contemplated such legal principles as might be established by the Legislature *in futuro;* if they had, they would have so expressed themselves. The language of the Constitution is language of present effectiveness; it can be referred by no rules of grammar or of legal construction, to any legal principles, except those at the time recognised by the State for which the Constitution was intended; that is the State of Georgia.

There are those who believe that the words *legal principles*, in the Constitution, embrace and refer to the law and custom of the Parliament of Great Britain. The argument of such persons is as follows : Parliament, at the adoption of our Constitution, in its exercise of supreme authority, did, and had, for many years, granted divorces for adultery; the repeated exercise of the power had established a parliamentary rule or principle ; to grant divorces for adultery was a law of Parliament, and the legal principles of our Constitution refer to that law as well as the common law. This argument is entitled to notice, only on account of the respectability of the sources from which it has occasionally emanated. We cannot imagine, in the first place, that if this had been the intention of the framers of the Constitution, that they would have left that intention to be ascertained by any loose and latitudinary construction. In this country, where we live under written constitutions, the meaning of such instruments is expressed with the most studied precision and the most transparent perspicuity. Our charters of liberty leave nothing to be implied which can be expressed. This is necessary in order to prevent the encroachments of power, whether executive, legislative or judicial. No people that have lived, understood this necessity half so well as the people of this Union and of this State. Can it be possible, that in this case, these rules of constitutional legislation were overlooked, and that the able men who framed the Constitution of 1798 and 1835, designing a thing so easy of precise expression, should have left it glim-

mering so obscurely through words of the broadest generality? Because, therefore, they have not so said, we think they did not intend to refer the courts to any law of Parliament.

Again. Does *the fact* that Parliament has granted divorces for adultery, constitute a law, or a principle of law? Adultery, as a ground for total divorce, is no part of the *lex et consuetudo Parliamenti;* a law which, according to Lord Coke, "*ab omnibus quærenda, a multis ignorata, a paucis cognita.*" The law and custom of Parliament, notwithstanding what Lord Coke says, is a well ascertained and very well understood system of rules; the Parliament itself is the judge of that law, and it relates to its own forms of proceeding, the elections, returns and qualifications of its members, the maintenance of its authority, &c. &c. It is not a law of general obligation; particularly has it no reference to adultery or divorces. The assumed Parliamentary law of divorce for adultery does not belong to the law and custom of Parliament; if it did, then there might be the shadow of plausibility, and no more, in the idea that our *legal principles* referred to it; because, as before stated, the law and custom of Parliament is a system of principles or rules.

What, then, is *the fact,* that Parliament did for years, at distant intervals, grant divorces for adultery? Why the exercise in particular cases of a discretion, which belongs to the sovereign authority of the British State? not a permanent rule, not an embodied general principle, but an expression, in particular cases, of the sovereign will. There is not, there never has been, any legal or constitutional obligation upon Parliament to grant divorces for adultery or any other cause; the Parliament has power, because it is the sovereign authority to grant them, and for the same reason to refuse them. That which we are, therefore, asked to confer upon our courts and juries, is the unfettered, unlimited, discretion of the incommunicable sovereignty, in this particular, of the British Empire. If we adopt the construction which I am now resisting, we give to the courts and juries in Georgia the power to grant divorces for all causes, as well as that of adultery, because the British Parliament has the power to grant divorces for all causes, or for no cause, as well as for adultery.

Again, if the usage of the British Parliament in this regard is but the exercise of a discretion, as we believe, then, upon the argument being reviewed, the framers of the constitution stand convicted of the weakness, in the very attempt to limit and define the

26

Head *vs.* Head.

powers of granting divorces in Georgia, of having clothed the courts with a power absolutely without limit or restraint. If, when they intend to limit the granting of divorces to *legal principles* they have adopted the discretion of the British Parliament, then indeed, have they defeated their own object.

Nor is the Constitution to be considered as referring to principles of law which quietly repose in the brains of learned men, or upon the pages of some profound commentary; not to principles existing in possibility, but existing in fact—to the law of the State prescribed by the supreme authority in the State.

What was the law of divorce prescribed by the supreme authority, and of force in Georgia, at the adoption of the Constitution in 1798? We answer the Eclesiastical or Canon Law of England; or rather that branch of the common law known and distinguished as the eclesiastical law. The common or unwritten law of England, consists of three kinds, to wit, general customs, particular customs, and certain particular laws, which, by custom are adopted and used by some particular courts of pretty general and extensive jurisdiction. Of the latter class is the canon or eclesiastical law, and therefore a part of the common law of Great Britain. 1 *Black. Com. t. p.* 45, 55. By the act of 25th February, 1784, usually called our Adopting Statute, the common law of England, and such of the statute laws as were usually in force in the Province of Georgia in 1776, so far as they were not contrary to the constitution, laws, and form of government of the State, as established in 1784, are declared to be in full force, virtue and effect, and binding on the inhabitants of the State until repealed, amended, or otherwise altered by the Legislature. *Hotchkiss,* 93, 94. Thus was the common law of Great Britain prescribed by the supreme authority of the State; thus was it, including the law of divorce, made the law of Georgia, unless it was contrary to the constitution, laws, and form of government established in 1784. We believe that the common law, as applicable to divorces, was not contrary to the Constitution and form of government of this State as they were established in 1784, nor to the laws of the State established at that time, because we know of no laws passed by the State anterior to 1784, upon the subject of divorces. And thus, too, stood the law of divorce in Georgia down to the Constitution in 1798; for, as we have before stated, we have searched in vain for any legislation upon the law of divorce before 1798. If the Legislature had passed laws declaring what would be good cause for divorce, at

any time anterior to 1798, without controversy those laws would have repealed the common law, and the *legal principles* mentioned in the Constitution would have been referable to them. But there were no such laws passed. It is true that, before 1798, the Legislalature, in the exercise of its unrestricted power, did grant divorces upon special application, and by acts limited in their effect to the parties in each case. These acts do not even exhibit the grounds upon which they were passed; and if they did, could they be considered as a declaration of legal principles, as laws of general obligation? We think not. Each divorce was a special exercise of the sovereign power, obligatory upon the parties and upon other citizens, and other departments of the Government, only so far as those parties were concerned. These were, in character, rather of judicial than legislative acts, and all the force they could exert was the moral force of precedents. All these remarks apply to the state of the law upon this subject down to the amended Constitution of 1835; before that period there was no legislation declaratory of the law of divorce; there were divorces granted, and there were, as we have seen, laws passed regulating the mode of proceeding, &c. nothing more. If, also, the common law had been repealed by Provincial legislation, the Provincial laws being revived by the act of 1784, the *legal principles* of the Constitution would be referable to such divorce laws as were established by Provincial legislation. But no such Provincial law or laws have come down to us. If there were any such, they are too deeply buried beneath the deposits of time for our power of revelation. We think there were none, or else they would have been, long ere this, exposed to the light. Many Provincial laws have been preserved, and some revived by special acts, but no divorce laws. It is barely possible that a diligent search into the Colonial records, preserved in England, but not accessible to this Court, might convict us of error; but, with the lights before us, it is our judgment that the legal principles mentioned in the Constitution of 1798, in the amended Constitution of 1835, and in the act of 1802, prescribing the form of the verdict in divorce cases, are the principles or rules of the common law, as received and understood in England on the 14th day of May, 1776.

An argument against this conclusion is sought to be derived from the 3d section of the Act of 1806. That section speaks of the *improper* or *criminal conduct* of the party against whom a divorce *a vinculo*, may be granted, and provides that "where the

marriage is declared void for such causes existing *before* the marriage, as are recognised by the Eclesiastical Courts, the parties may marry again, &c." The inference is drawn, from the words and provisions of this section, that the Legislature believed that total divorces might be granted in Georgia for causes supervenient, and therefore for causes not recognised at common law; and that this act is a construction of the meaning of the words *legal principles*, denying its reference to the common law. We admit that it is a fair inference, from the terms and provisions of this act, that the Legislature believed that divorces might be granted in Georgia for causes supervenient, and therefore for causes not recognised at common law. But this clause *enacts* nothing as to what are or are not causes for a divorce, and this Court does not hold itself bound by a legislative interpretation of the Constitution, drawn collaterally and by implication from legislative acts; we must judge of that instrument for ourselves; and if this section were viewed, for the purposes of the argument, as an enactment defining causes of divorce, this Court would still be compelled to pronounce upon its constitutionality; and if, as we have decided, the Constitution has ordained and stereotyped the common law, and the section was found in conflict with it, we would pronounce it unconstitutional. And why should not the framers of the Constitution be considered as referring to the common law? Whilst, as we shall more fully explain, we think the common law, as to divorces, ought to be changed, and we trust will be changed, in one particular at least, as soon as the Constitution can be amended, yet we can see strong reasons why our Fathers should be willing to engraft it upon the fundamental law of the State. The common law declares for what causes the marriage contract may be totally annulled, and these causes are derived from the idea of the Romish Church, that marriage is a sacrament; yet the canon law was received and engrafted upon the common law recognised by Parliament, and acquiesced in and approved by the Protestant Church. It was commended to the framers of our Constitution in this, that it was the law of the Father-land—the most enlightened State of Christendom—because it was sanctified by ancestral associations, and was proved to be adapted to the genius and habits of the freest people, next to our own people, on earth. If the hearths and the altars, and the constitution of England, were found, by her fathers and her divines, and her statesmen, to be, for many centuries, safe

under the common law of divorce, well might our own sages believe it to be adapted to the people and the institutions of Georgia.

Let us briefly inquire now, what are the provisions of the common law in relation to divorce. "Divorces are either such as dissolve *a vinculo matrimonii*, and set the parties at liberty, so that they may marry when they please afterwards, or such as separate *a mensa et thoro*, from bed and board only; in which last case the marriage continues in force, so that if either of them marry, such other marriage is void." *Bacon's Abr. vol. 5, title E, Marriage and Divorce;* 1 *Black. Com.* 353; *Com. Dig. Baron & Feme, c.* 1. The only grounds recognised by the canon and common law for a total divorce, are, pre-contract, consanguinity or relation by blood, affinity or relation by marriage, and corporeal infirmity. These do not make the contract void *ipso facto*, but voidable by sentence of the Eclesiastical Courts; and are either grounded upon the express words of the divine law, or are consequences plainly deduceable from them. 1 *Black. Com.* 146; *Bacon's Abr. title E, Marriage and Divorce; Coke Lit.* 235; *Moor*, 225; 2 *Leon* 169; *Dyer*, 178; *Pl.* 40. These causes, in order to set aside the marriage contract, must exist at the time of making it. The corporeal infirmity, for which a total divorce may be granted, is called in the books impotence, or frigidity. As the pro-creation of children is one of the prime objects of the marriage contract, a natural impotence to fulfil its end, existing at the time of entering into, will avoid it. *Bacon Abr. title Marriage and Divorce, A and E.* And these are, according to the view that we have taken of the Constitution and laws of Georgia, the causes, and the only causes—the *legal principles*—for and by which a divorce, *a vinculo matrimonii*, can be granted in this State.

In England, the marriage contract can be annulled for causes arising after it is made, by no power save that of Parliament; in Georgia, by no power whatever, the Constitution having divested the Legislature of all power over it.

Partial divorces, that is *a mensa et thoro*, are allowed by the [2.] common law when the marriage is just and lawful *ab initio*, and therefore the law is tender of dissolving of it; but, still it becomes expedient to separate the parties for supervenient causes, which make it improper or impossible for them to live together. Partial divorces are not favoured by the law, for facility in their procurement tends to licentiousness, and to the serious injury of children. The benefits to children, which result from the steady example of

conjugal fidelity, of domestic happiness, and of early moral, and intellectual culture, are lost by the separation of parents.   Separation is always a reproach to one, very often a reproach to both parties, which is visited with cruel severity upon their unoffending offspring.   Blackstone says that intolerable ill temper is cause for a partial divorce; according, however, to better authority, it is not.   1 *Black.* 354.   There are only two causes known to the common law for divorces *a mensa,* to wit, adultery and cruel treatment.   They are allowed *propter sœvitiam aut adulterium.*   And where there is a separation for such a cause, and the parties come together again, the same cause cannot be revived.   *Evans* vs. *Evans,* 1 *Haggard R.* 36; 11 *Ves. Jr.* 532; 2 *Kent,* 125; *Bacon's Abr. Title Marriage and Divorce, E.* In determining what is *saevitia* by the Eclesiastical Law, it has been adjudged to be necessary that there should be a reasonable apprehension of bodily hurt; the causes must be grave and weighty, and show a state of personal danger, incompatible with the duties of married life; mere austerity of temper, petulance of manners, rudeness of language, a want of civil attention, even occasional sallies of passion, if they do not threaten bodily harm, do not amount to the cruelty against which the law can relieve.   Against all these the wife is commended to the potent, but not always availing law of kindness; or, as Chancellor Kent has it, "the wife must disarm such a disposition in the husband by the weapons of kindness."   Weapons which subdue the generous, the just and the brave, but which are impotent when turned against the cowardly, the selfish, and the brutal.   See the learned opinion of Sir William Scott, in *Evans* vs. *Evans,* 1 *Haggard's R.* 36; 2 *Kent,* 125.

In England, cruelty and adultery are good causes for a partial divorce, at the instance of either party.   1 *Haggard's Cons. R.* 409.   And the terms of the separation are within the discretion of the Court, who will also make suitable provision for the wife and children.   Such is the common law upon this branch of our subject.   In the States of our Union the causes recognised for granting divorces *a mensa* are various.   The English law is the rule in Georgia; and it is certainly to be commended for its cautious and conservative tendencies.   It seems to be, and with good reason, loth to throw the parties back upon society, in the "undefined and dangerous character of a wife without a husband, and a husband without a wife."

At the hearing of the case now before this Court, the plaintiff in

error argued the question only in reference to a total divorce, in fact disclaiming any desire for a partial divorce; the judgment of the Court was, therefore, made up upon the main question only. When, however, it was pronounced, the plaintiff's counsel asked the opinion of the Court upon his right to a partial divorce upon the ground taken in the libel, to wit, abandonment by the wife. Being compelled thus to give some direction to the case, without argument and without opportunity for investigation, Judges Warner and Nisbet, (Judge Lumpkin not being at that time present, although present at the hearing, and uniting in the judgment of the Court as pronounced,) thought it safe to send the case back, with instructions, that the separation, and the circumstances attending it, be submitted to the jury for their consideration, with a view mainly to a more mature consideration of the point *of law*. That act is not, therefore, to be taken as a rule to be observed in future, for we are fully satisfied that desertion, or abandonment by the wife, is not a good cause at common law, and in Georgia, for a partial divorce.

In reviewing the history of divorces, it is obvious that there has been, from Moses to Christ among the Jews, and from the savage to the civilized state in all nations, a progressively increasing reverence for the married state, and a gradually narrowing rule for the dissolution of the marriage contract. Moses' *bill of divorcement* was easily had; reasons why it was so may be found in the then comparatively infant state of the world, in the peculiar economy of the peculiar people over which he was called to rule, in the stringent severity of the Mosaic Law in relation to all the decencies and proprieties of family life, (which no doubt restrained the abuse of the right of divorcement,) and in the *hardness of the hearts* of the people. I have not time, if it were proper, to trace these reasons in detail. In all Eastern countries, because of the toleration of polygamy, and the consequent low estimate of the marriage contract, divorces are frequent, being allowed for slight causes; and, as a consequence, a deplorable laxity, if not licentiousness of morals, prevails. In the Pagan States of Greece and Rome, the rule was as lenient and loose as among the ancient Jews; yet it is pleasant to see how the abuse of it, particularly at Rome during the Republic, was restrained by experience of the value of the domestic relations. No character, which antiquity affords, is more simply grand and beautiful than that of the Roman nation. There is a moral sublimity in the mother of the Gracchi, in Portia, in Volumi-

nia, Lucretia, and all of that class.    The estimation in which the
Roman matron was held, is proof of the popular reverence of the
connubial state.    Indeed we know, as a mere matter of historical
truth, that in the earlier and best days of that renowned Common-
wealth, notwithstanding  the facility of getting divorces, (the hus-
band having in fact the freedom of divorce,) there were very few.
The Republic had subsisted five hundred years before a single case
had occurred.    And in the days of Augustus, when social degener-
acy had seized the State, Horace gives the following beautiful ex-
position of the popular feeling in relation to the value of the mar-
riage union :

> " Felices ter et amplius
> Quos irrupta tenet copula; nec malis
> Divulsus querimoniis,
> Suprema citius solvet amor die."—*Lib.* 1, *Car.* 13.

Thrice blessed are they whom an indissoluble union joins, and
whose love, sundered by no discordant jars, shall not cease until
the end of life.    Still it is not to be questioned, that during the
most refined periods of Roman history, such maxims as *"matri-
monia debent esse libera,"* (according to the Civil Code,) visited upon
society the most baneful curses.

In the Catholic countries of Europe divorces are not allowed for
any supervenient cause, except in France.    The revolution in
France repudiated, with the Bible, the sanctity of the marriage
contract altogether; and the natural consequence was six thousand
divorces, in Paris alone, in a little more than two years.    The Na-
poleon Code allows divorces for adultery and grievous injuries and
other causes, and also without cause, upon consent of parties.    By
the laws of Holland, adultery and malicious desertion are the only
allowable causes of total divorce.    The result is, that no where in
Europe do the domestic virtues more abound.    In New York
adultery, under cautious restrictions, is the only cause for total di-
vorce; whilst in most of the other States wilful desertion, intoler-
able ill usage, unheard of absence, habitual drunkenness, or some
of them, in addition to adultery, will authorize a divorce *a vinculo.*
In relation to these numerous causes of divorce Chancellor Kent
makes these remarks : " It is very questionable whether the facility
with which divorces can be procured in some of the States be not
productive of more evil than good.    It is doubtful whether even
divorces for adultery do not lead to much fraud and corruption."
Such is the opinion of one of the calmest, purest, greatest men of
this age; instructed by many years of judicial experience.

Head *vs.* Head.

But the reasons against polygamy, and against divorce, are traced to the creation of man. This creation was dual and sexual; two, and only two, one male and one female, wedded in the bowers of Paradise, God himself declaring the union; and what God has joined together let not man put asunder. Such are the teachings of him who spake as never man spake. When Christ came, the Jewish divorce law, and also the speculations of heathen philosophers, were repealed upon Divine authority — *He* taught, that for only one cause should the marriage contract be annulled, and that is *adultery*. *Matthew* 19*th*, 3 *to* 12.

So various are the views of learned men, in all parts of the world, and so diverse are the legal provisions of the states of the world, and so various have been the opinions and enactments of the men and states of antiquity upon this subject, that it is not easy to form an opinion, upon authority, as to what causes ought to justify a total divorce. It is manifest that the law upon this subject ought to be framed with reference to the society upon which it is to operate; particularly to the mental culture and moral elevation of that society. For example, the common law, which excludes all supervenient causes, would not suit the domestic condition and moral habitudes of the people of France. Nor would the Code Napoleon, which admits almost any cause, work well amidst the quiet homes and sterling moral qualities of England. We may safely say, that in proportion as a people appreciate and yield to the general doctrines and requirements of the religion of the Saviour, may they safely adopt his rule upon this subject. And we have no doubt but that, when the religion of the New Testament becomes in the main operative upon the hearts and influential over the conduct of all men, all diversities of legal principles, in regard to divorces, will be harmonized.

Under the benign institutions which Providence has vouchsafed to us, living as we do under the influence of the Bible, and with education very much diffused among the people, it does not still seem to me that we have attained to that degree of moral and social purity which will render expedient the negation of all causes for divorce. On the contrary, the largest interest of the community would seem to make it necessary that for *adultery* the marriage contract ought to be dissolved. The reason given by Blackstone why adultery is not a sufficient cause for a divorce *a vinculo*, is that it is a matter within the power of either party, and if allowed, divorces would always be within the power of either party. This is

27

not sufficient reason to exclude it altogether, but the strongest reason why the law should so guard the granting of divorces for this cause as to prevent its abuse. Proof of adultery should not be sufficient in all cases to authorize a divorce. If the act of adultery is by procurement, or with the connivance of the other party, or if there has been *condonatio injuriæ*, a forgiveness of the injury, proved by express testimony, or by the voluntary cohabitation of the parties with the knowledge of the fact, or if the libellant has been guilty of the same offence, adultery ought not to be sufficient to dissolve the contract. The offending party ought not to be allowed to marry again; and, to prevent collusion by fraudulent assent, the confessions of the accused party should never be received as sufficient of themselves to establish the fact. In all cases where the wife is complainant, the Court ought to make suitable provision out of the estate of the husband for the wife and children; and if the husband is the complainant, he ought not to be disturbed in any property rights which he would enjoy if the union had continued; these provisions would operate as a salutary check upon the adulterous inclinations of both parties. It is a prevalent opinion that the adultery of the husband is less injurious to the order and peace of families than that of the wife, and ought not, therefore, to be held an offence of as great enormity, and visited with as serious consequences. Of this opinion is Montesquieu, Pothier, and Doctor Taylor. Public opinion in this State does not seem to hold the husband's delinquency in this regard so great as the wife's. This judgment of the public mind, whilst it may be considered as illustrative of the high estimate placed upon female virtue, is at the same time without foundation in principle. It is to be feared that it is owing in a great degree to the prevalence of the vice amongst men. It derives immunity from its too general prevalence. The moral character of the act is the same in either case. Its consequences to the wife, when perpetrated by her husband, are as cruelly destructive to her peace as her infidelity can be to his. Yet she is required to endure meekly what he is justified in making good cause for loathing, contempt, and repudiation. In this award of the world there is neither nature nor equity. And it is gratifying to see that things are hastening to that degree of moral illumination, at which point men and women, so far as concerns social rights, will occupy positions of essential equality. Nor is the effect upon the family more disastrous in the one case than the other. Maternal infidelity will reproach her offspring redeemlessly. Aban-

doned paternal character, although not so immediate and direct in its destruction, may and does demoralize and injure entire generations of offspring. If society made the same requirements of men that it makes of women, it would wear a lovelier aspect, its bloom would be more fragrant, and its fruit sweeter. The way to bring this about is in all cases to brand the offences of men with the same relentless reprobation which is stamped upon female guilt.