## RING v. RING.

1. "Cruel treatment," within the meaning of the Civil Code, § 2427, which provides that such treatment shall be a ground for divorce, is the wilful infliction of pain, bodily or mental, upon the complaining party, such as reasonably justifies an apprehension of danger to life, limb, or health. *Odom* v. *Odom*, 36 *Ga.* 286, approved and followed. *Gholston* v. *Gholston*, 31 *Ga.* 625, and *Myrick* v. *Myrick*, 67 *Ga.* 771, doubted, criticized, and distinguished.
2. It follows that the habitual and intemperate use of morphine, unaccompanied by any conduct coming within the definition laid down in the preceding headnote, is not such cruel treatment as the law recognizes as a ground for divorce.
3. The intention to wound is a necessary element of the cruel treatment for which a divorce is allowed.

Argued March 19,—Decided June 3, 1903.

Libel for divorce. Before Judge Felton. Bibb superior court. August 12, 1902.

*Marion W. Harris*, for plaintiff in error. *John P. Ross*, contra.

CANDLER, J. As will be seen by reference to the case of *Ring* v. *Ring*, 112 *Ga.* 854, the defendant in error in the present case at first brought a suit for divorce against his wife, Mrs. Mamie S. Ring, under the Civil Code, § 2427, on the ground of her habitual intoxication from the intemperate use of morphine and other opiates. The jury returned a verdict finding a total divorce for him, but the judgment of the lower court was reversed by this court, on the ground that "'Intoxication,' as used in section 2427 of the Civil Code, which provides for the granting of a divorce on the ground of 'habitual intoxication,' means drunkenness produced by alcoholic liquors, and not the condition resulting from the excessive use of morphine." The plaintiff then dismissed his suit and brought the

present action, which is based upon the ground of cruel treatment of the plaintiff by the defendant, consisting of the habitual use of morphine.    The petition sets forth various acts of misconduct on the part of the defendant, but it affirmatively appears from the allegations made that these acts were committed while the defendant was under the influence of morphine, and as a direct result of the use of that drug; and the petition, taken as a whole, presents definitely, as a ground for divorce, alleged cruel treatment consisting in the persistent and intemperate use of morphine.    To this petition the defendant demurred generally, "and particularly, for the reason that the allegations of fact therein contained do not constitute cruel treatment under the law."  This demurrer was  overruled. The defendant also filed an answer, and the issue thus formed was submitted to a jury, who found for the plaintiff a total divorce. The defendant made a motion for new trial, which was denied ; and to the overruling of her motion and of her demurrer she now excepts.    It is agreed by counsel on both sides that the only real questions before this court are made by the demurrer, and the general grounds of the motion for a new trial, that the verdict was contrary to law and the evidence. It may be said at the outset that the evidence for the plaintiff fully sustained the allegations of his petition, and in this connection the following, quoted from the testimony of the plaintiff as contained in the brief of evidence, is worthy of notice as bearing upon the real meaning and intent of the petition :.  "The use of morphine was the only objection that I ever had to her.    That was the only complaint I made, and the only complaint I make now."    We have, then, presented for our determination the clear-cut question, is the habitual use of morphine such cruel treatment as will constitute a ground for divorce under the laws of Georgia?

1, 2. This court has, both by approval of definitions given by other courts, and by its own rulings, set forth its understanding of the meaning of the "sævitia" of the English law, or "cruel treatment," as it is known in our own.    In the earliest case on this subject to be found in our reports, that of *Head* v. *Head*, 2 *Ga.* 191, Nisbet, J., delivering the opinion, held that the English law as construed by the courts of that country prevailed in this State, and that only for the causes prescribed by the common law as of force in England at that time could divorces be granted here.   On page

206, the court said: "In determining what is *sævitia* by the eccle-
.siastical law, it has been adjudged to be necessary that there should
be a reasonable apprehension of bodily hurt; the causes must be
grave and weighty, and show a state of personal danger, incompati-
ble with the duties of married life; mere austerity of temper, petu-
lance of manners, rudeness of language, a want of civil attention,
·even occasional sallies of passion, if they do not threaten bodily
harm, do not amount to the cruelty against which the law can re-
lieve." In *Smith* v. *Smith*, 84 *Ga.* 440, the *Head* case was con-
sidered, and the conclusions therein announced distinctly upheld,
to the effect that the English ecclesiastical law, as there held, was
in effect in Georgia until the passage of the act of Feb. 22, 1850.
The act of 1850 (Civil Code, §§ 2426 et seq.), in setting out the
grounds for divorce in this State, did not define cruel ·treatment,
or make any attempt to change the construction already placed
upon the expression by this court. It did change the law so as to
authorize the jury trying the case to grant a total or partial divorce
·on this ground, according to the circumstances of the case. Prior
to its passage, the common-law rule prevailed in Georgia, and for
·cruel treatment only a partial divorce could be procured. It is dif-
ficult for us to believe that the legislature intended at one and the
same time to make more far-reaching the effects of cruel treatment
and to put a more lax construction upon that expression. The act
of 1850 was probably brought about by the decision in the *Head*
case, cited supra, as the effect of the judgment rendered in that
case was to cut off divorces on some of the grounds on which they
had previously been granted in Georgia; and the purpose of the
act was evidently to extend the law so as to increase the number of
grounds upon which divorces could be obtained. The court had,
in the *Head* case, expressly approved the definition of the term
"cruel treatment" given by the English courts, and there is noth-
ing in the act of 1850 to indicate that the General Assembly had
any intention to give it a different construction.

We will now consider what were the rulings of the English ec-
·clesiastical courts, on which the judgment in the *Head* case was
based. In the leading case of Evans *v.* Evans, 4 Eng. Ecc. Rep.
310, decided in 1790, the court declined the task of laying down
a direct definition of the term, but said: "The causes must be
grave and weighty, and such as show an absolute impossibility that

the duties of the married life can be discharged. In a state of personal danger no duties can be discharged; for the duty of self-preservation must take place before the duties of marriage, which are secondary both in commencement and in obligation; but what falls short of this is with great caution to be admitted. . . What merely wounds the mental feelings is in few cases to be admitted, where they are not accompanied with bodily injury, either actual or menaced. Mere austerity of temper, petulance of manners, rudeness of language, a want of civil attention and accomodation, even occasional sallies of passion, if they do not threaten bodily harm, do not amount to legal cruelty: they are high moral offences in the moral state undoubtedly, not innocent surely in any state of life, but still they are not that cruelty against which the law can relieve. . . There must be a reasonable apprehension of bodily hurt." In the case of Westmeath *v.* Westmeath, 2 Haggard, 238, the court quotes from the Evans case, and says that the ecclesiastical courts have been uniformly strict in holding that, to make out a case of legal cruelty justifying a divorce, there must be proof of actual injury or of real apprehension of injury as it may affect the safety or the health of the person. In all cases where the infliction of mental suffering has been held to justify a divorce, except where the decisions were controlled by peculiar statutes, the judgments have proceeded upon the idea that the mental anguish caused was so grievous as to endanger the health of the complaining party. We have already seen that prior to the passage of the act of 1850 the English definition of the term "cruel treatment" was the one adopted by our court, and this doctrine prevailed until ten years after the passage of that act, as is shown by the opinion of Judge Benning in the case of *Buckholts* v. *Buckholts*, 24 *Ga.* 238, where, on page 244, the following language was used: "And may we not lay it down for law, that, to make out a case of cruelty, 'there must be either actual violence committed, attended with danger to life, limb, or health, or there must be a reasonable apprehension of such violence;'" citing Bish. Mar. & Div. § 454, note 1. In the case of *Johns* v. *Johns*, 29 *Ga.* 722, Chief Justice Lumpkin, in passing upon a charge given by the trial judge where a husband was seeking a divorce from his wife on the ground of cruel treatment, recognized the doctrine that to sustain a suit for divorce on this ground the libellant must show that there was a reasonable apprehension of

danger from living with the defendant; and held that any conduct of the husband tending to show that there was no such apprehension on his part was admissible to rebut the charge of cruelty. The decisions of the English courts are also cited in the opinion to sustain another branch of the decision in that case; and it is manifest that the court did not construe the act of 1850 as changing the law as it existed in England and Georgia prior to its passage, except in so far as a particular intention to do so was clearly shown.

Apparently somewhat antagonistic to this doctrine are the cases of *Gholston* v. *Gholston*, 31 *Ga.* 625, decided at the November term, 1860, of this court, and *Myrick* v. *Myrick*, 67 *Ga.* 771, which was decided at the January term, 1861, but the opinion in which was, for some unknown reason, withheld from publication for over twenty years. Both of these cases were suits brought by the wife against the husband on the ground of cruel treatment, and the specific acts of cruelty shown in both were amply sufficient to bring them within the strictest construction of the rule laid down by the ecclesiastical courts and the earlier decisions of this court. In neither of these cases was there any suggestion of reviewing the earlier cases of *Head, Johns,* and *Buckholts,* nor was there anything in the pleadings or the facts of either that called for such a review. A careful consideration of the *Gholston* case shows that what was said in the *Myrick* case to have been therein held was in reality not held, — an error which probably grew out of the misleading nature of the third headnote in that case. The headnote referred to is as follows: "The charge of the court below (incorporated into the opinion) correctly expounds the law of divorce, in such a case, upon all the points made against it in the bill of exceptions." In the opinion is set out a rather lengthy extract from the judge's charge, much of which was then, and still is, sound, a portion of it, however, being in conflict with the previous rulings of this court. But the motion for new trial pointed out no error in this extract. While the rule as to assignments of error on charges in this court was not so stringent at that time as now, still the writer can not see, even under the rule as it then was, where a long extract from a charge is excepted to, and most of it is good law, how a new trial could be granted on a small part of it that was not sound, — no exception being made to the bad alone. The court dealt with all the exceptions to various extracts of the charge in the following general man-

ner: "We overrule all the exceptions from the 3d to the 8th inclusive, holding that, on all the points therein made, the court gave the law in charge to the jury." The *Gholston* case was decided December 3, 1860. The *Myrick* case, which was decided February 12, 1861, cites the *Gholston* case as authority, but, as before stated, does not mention any of the earlier cases, one of which was decided before, and the others after, the passage of the act of 1850. In so far, therefore, as it essays to lay down any rule by which to determine what is cruel treatment within the meaning of the law of divorce, different from that already expounded by the courts of this State and of England, it is in no manner binding as authority, because it is in the teeth of prior adjudications to the contrary.

In the case of *Odom* v. *Odom*, 36 *Ga.* 286, this court, speaking through Chief Justice Warner, evidently did not consider either the *Gholston* or the *Myrick* case binding as precedent; for in the opinion, on page 317, it is said: "In view of the various grades and conditions of mankind in society, it is extremely difficult to assert any definite rule, applicable to all classes of society, as to what will constitute legal cruelty. Legal cruelty may be defined to be, such conduct on the part of the husband as will endanger the life, limb, or health of the wife, or create a reasonable apprehension of bodily hurt. What must be the extent of the injury, or what particular acts will create a reasonable apprehension of personal injury, will depend upon the circumstances of each case. The acts of cruelty must be such as to render cohabitation unsafe, or are likely to be attended with injury to the person or to the health of the wife." Citing Evans *v.* Evans, and Westmeath *v.* Westmeath, supra. The case cited was one in which the wife was the libellant, but under our law the doctrine announced is equally applicable in a case where the husband is the complaining party. The case of *Glass* v. *Wynn*, 76 *Ga.* 319, cites the *Myrick* case approvingly, but it holds nothing to the contrary of the *Odom* case, and the language used was not necessary to the ruling made. The case of *Ray* v. *Ray*, 106 *Ga.* 260, which was an alimony proceeding, also cites the cases of *Myrick* v. *Myrick* and *Glass* v. *Wynn*, as authority for the proposition that slanderous reports made by the husband against the wife, and which were brought to the wife's attention, to the effect that she had been untrue to her marital vows, was such cruelty as would justify the wife in separating

herself from her husband, and that having left him for that reason she would be entitled to alimony. Such conduct on the part of a husband has by numerous courts been held to be cruel treatment, on the idea that a man who would so outrage the feelings of his wife, and so brutally trample upon her sensibilities, is not a safe person for her to live with; that such a man is necessarily of an extremely jealous temperament and subject to violent paroxysms of passion, the occurrence of which would reasonably create an apprehension of bodily harm to the wife; and that the knowledge by a virtuous wife that she was thus being subjected to the vilest calumny by the one from whom she had the right to expect the tenderest consideration would have a tendency to cause her such mental anguish as to seriously threaten her physical well-being. 1 Bish. Mar. & Div. § 1574. As has been noticed, however, the *Ray* case was an alimony proceeding, and the language of the court to the effect that the conduct mentioned would sustain an action for divorce was plainly obiter. So much has been said for the purpose of demonstrating that on the question under consideration neither this court nor the lawmaking power of the State has ever departed from the well-settled conservative principles of the English law. On the other hand, from the date of the adopting statute, in 1784, down to this good hour, it has been the policy of the law in this State to refuse divorces when sought for reasons of convenience, or on account of differences of temperament or petty grievances between man and wife.

3. The original act providing for cruel treatment as a ground of divorce used the words, "in case of cruel treatment on the part of one *towards* the other." To the mind of the writer this language expresses an idea altogether at variance with that upon which the petition in the present case is based. Cruel treatment, such as must have been in the contemplation of the lawmakers, necessarily involves the doing of some act with the intention of causing pain or suffering to the other party,—else, why the language "on the part of one towards the other"? Plainly, the meaning is, an act done, a word spoken, abuse *directed towards* the other; a setting in motion by one party, by word or act, of something the purpose of which is to cause pain and suffering to the other. It must be the intention of the offending party to injure—to wound. It must be a wilful act the purpose of which is to hurt. Words spoken or acts

done may cause the greatest pain — the most acute suffering, but in the absence of an intention to wound they do not constitute the cruel treatment contemplated by the law as a ground for divorce. In the present case the allegations of the petition and the testimony of the witnesses show that Mrs. Ring was guilty of conduct highly disagreeable in its consequences to her husband, but there is an entire absence of any showing that she was actuated by any desire or intention to inflict the pain which he is alleged to have endured. It seems that she had, previously to her marriage, been the victim of a railroad accident, in which she suffered severe internal injuries, and that while undergoing medical treatment for those injuries she became addicted to the habitual use of morphine, which continued during the eight years that she and her husband lived together. Its use was, to her, a seeming necessity, and when in want of it she suffered intensely. It appears that, in order to quiet her, her husband himself on occasions procured the drug and gave it to her. When deprived of it she would, at times make exhibitions of her condition which amazed not only her husband but the neighborhood in which they lived, and caused him much humiliation. Her frantic screams, when begging for morphine, often caused the neighbors to believe that he was mistreating her. While all this must necessarily have been very mortifying to her husband, none of her acts were done with that intention. None were wilful, malicious, or wanton; but all were the result of her uncontrollable desire for this terrible narcotic.

We are not alone in the position that intention is a necessary element of the cruel treatment which the law recognizes as a ground for divorce. Massachusetts has a statute which allows a divorce on the ground of "cruel and abusive treatment." In the comparatively recent case of Wood *v.* Wood, 141 Mass. 495, Mr. Justice Holmes, who is now an Associate Justice of the United States Supreme Court, delivering the opinion, said: "The single question reserved is whether the practice of masturbation by a husband in the presence of his wife, but without compelling her to remain present, which injures her health by its effect upon her feelings, is 'cruel and abusive treatment' within the" meaning of the law. "We will assume, although it is not found as a fact, that the libellee knew how his conduct worked upon his wife; and we fully agree that, in general, foresight of a consequence of one's act has

the same effect upon liability for procuring it as intent to produce that consequence. . . . But the actual intent and purpose with which an act is done may be of importance when the question is not one of liability, but of dissolving the marriage tie. Certainly they may be made so by statute. The words 'cruel and abusive treatment,' seem to import on their face conduct directed towards the other party, and with a malevolent motive. Without deciding that a case could not be imagined which would fall within the meaning of the words without such a motive, it is enough to say that purely self-regarding conduct, not forced upon even the knowledge of the wife otherwise than by the usual intimacy of matrimony, does not constitute the offense, merely because its folly, its disgusting character, or its wickedness disturbs her nerves or conscience, and thus affects her health." In another case from the same State, that of Ford v. Ford, 104 Mass. 198, it was held that to make out a case of cruel treatment the same must be "intentionally inflicted." In the case of Miller v. Miller, 78 N. C. 108, the court said: "The husband's conduct was not consciously or wilfully to the annoyance of the wife. His acts were not intended or expected to annoy her. . . The indignity to her feelings was not wilful on his part;" and it was held that the petition of the libellant must be dismissed. In Everton v. Everton, 5 Jones (N. C.), 210, which is another case decided by the same court, the court said: "Whether any other circumstances of insult and injury, short of violence to, or threats against, her person, would be a sufficient ground of relief, and if any, what, it is not necessary for us now to say. If there be any such, they must have, as an essential ingredient, a wilful and malicious intent to offer insult, and do injury; and such intent must be alleged and proved. A wrong inflicted from mere thoughtlessness, or without due consideration for the feelings or situation of the wife, may deserve censure; but in the absence of a malicious intent, it can not be allowed the effect of sundering the strong bond of marriage." To the same effect see Shaw v. Shaw, 17 Conn. 189; 1 Bish. Mar. & Div. § 1575, where it is laid down that an unintentional act, "though occasioning pain and injury, will not warrant a divorce." The reason of this doctrine grows out of the rule that prevails both in the ecclesiastical law and the law of most if not all of our States, viz., that there must be, arising out of the cruel treatment complained of, a reasonable apprehension of danger to life, limb, or health.

In those States where the greatest latitude is allowed in the grant of divorces, where threats, unkind words, jealous accusations, and the like are held to be cruel treatment within the meaning of the law, the decisions proceed upon the idea that those things imply a state of bad feeling which in the nature of things will eventually result in danger of bodily harm to one party or the other. While habitual drunkenness is, by statutory enactment in many States, including our own, made a ground for divorce, in but few jurisdictions has drunkenness, unmixed with other misconduct, been held to constitute cruel treatment.     In 73 Am. Dec. 628, in a note to the case of Morris *v.* Morris, 14 Cal. 76, 73 Am. Dec. 615, it is said : " Drunkenness, although long continued and excessive, is not of itself such cruelty as will constitute ground for divorce.     It may entail upon the wife much misery, and a life-long trial of patience and fruitless hope, but if unaccompanied by real or apprehended physical injury it is insufficient ; the court will not unsettle the law, or depart from the decided cases, to indulge its feelings or to sympathize with a petitioner's misfortunes." Citing Hudson *v.* Hudson, 3 Swab. & T. 314; Brown *v.* Brown, L. R. 1 P. & D. 46 ; Waskam *v.* Waskam, 31 Miss. 154; Haskell *v.* Haskell, 54 Cal. 262.     In Haskell *v.* Haskell, supra, the court said : " That adultery or habitual intemperance would, in a popular sense, constitute extreme cruelty, we do not question.   And so would willful desertion or willful neglect.     But, in a legal sense, extreme cruelty is something different from any of the other causes of divorce, and constitutes a separate and distinct cause of action.     Otherwise, it would be unnecessary to specify any other cause than extreme cruelty as a ground of divorce in any case."   Again, where a brutal stepfather beat and mistreated the children of his wife, but the purpose of his conduct was not to distress or annoy the wife or to wound her feelings, but was due solely to his hatred or ill will toward the children, it was held not to be cruel treatment.   Wallscomb *v.* Wallscomb, 11 Jur. 134; Perry *v.* Perry, 1 Barb. Chan. 516, holds practically the same principle where the wife was cruel to the children of the husband.   But where the beating was done in the presence of the wife and for the purpose of wounding her sensibilities, it was held to be cruel, on the idea that her suffering, although mental, was a menace to her health, and showed such a disposition on the part of the husband as to justify an apprehension on the part

of the wife of bodily harm to herself.　　Bramwell *v.* Bramwell, 3 Hagg. 618, s. c. 5 Eng. Ecc. R. 232; Friend *v.* Friend, 53 Mich. 543; Gleason *v.* Gleason, 16 Neb. 15.　　There is authority for the position that the word "treatment" includes any behavior of one party which affects the other, physically or mentally, whether with a malevolent motive or not.　Robinson *v.* Robinson (N. H.), 23 Atl. 362.　　The decision in that case, however, was made under a statute which authorized divorce for conduct seriously injuring the health or endangering the reason of the complaining party.　It was held that under that statute a malevolent motive need not be proved; that divorce is not intended as a punishment of the offender, but for the protection of the sufferer.　"Whether the behavior proved is a sufficient ground of divorce depends on the question whether it has seriously injured health or endangered reason." The decision is placed solely on the words of the statute, although the reasoning employed is opposed to the idea set forth in the Massachusetts case of Wood *v.* Wood, supra.　In many former decisions of this same court, defining "cruelty of either party to the other," there is much authority for the construction placed by us on our statute.　　In Poor *v.* Poor, 8 N. H. 307, Richardson, C. J., says: "In the judgment of law, any willful misconduct of the husband which endangers the life or health of the wife; which exposes her to bodily hazard and intolerable hardship, and renders cohabitation unsafe,—is extreme cruelty. . . . Whenever force and violence, preceded by *deliberate* insult and abuse, have been once *wantonly* and without provocation used, the wife can hardly be considered safe."　　The case of Harratt *v.* Harratt, 7 N. H. 196, holds that under the statute in New Hampshire a divorce will not be granted on the ground of cruelty for conduct not *wanton* and *willful* and directed towards the innocent party.　In the Robinson case, supra, it appeared that the New Hampshire statute had been enlarged, and the court held that it was for the very purpose of providing for divorce in cases like the one now under consideration, where the conduct complained of did not fall within the established definition of cruel treatment.

We have carefully examined all the cases cited in the brief of the able counsel for the defendant in error, which were decided by courts other than our own, and which lay down a different doctrine from that here announced; and we find that in many instances they

are controlled by special statute utterly unlike our own. Thus, in the case of Dawson *v.* Dawson, 23 Mo. App. 169, where it was held that "the habitual use of opiates, whose tendency is to render the user callous, reckless, untruthful, and stupid, to cause physical prostration, to undermine and destroy all the objects of the marital relation, and which habit is usually incurable, constitutes such indignities as furnish ground for a divorce," it appears that the Missouri law especially provides for the grant of a divorce where either the husband or the wife "shall offer such indignities to the other as shall render his or her condition intolerable." So also the Texas case of Sheffield *v.* Sheffield, 3 Tex. 79, was decided under a statute which declared that "a divorce from the bonds of matrimony may be obtained, where either the husband or wife is guilty of excesses, cruel treatment," etc. The case of Barnes *v.* Barnes, 95 Cal. 171, besides being directly contrary to the ruling in the earlier California case of Waldron *v.* Waldron, 85 Cal. 251, proceeds under a special provision of the law of that State, which expressly defines cruel treatment to be "the infliction of grievous bodily. injury *or* grievous mental suffering upon the other by one party to the marriage."

If the General Assembly sees fit to extend the provisions of the Georgia law on this subject, it has, of course, the power to do so. This court has neither the power nor the inclination. We can find no authority of law in this State for granting divorces to either party for any conduct, no matter how disastrous its consequences, which does not amount to intentional violence to the injured party, or create a reasonable apprehension of such violence. Our legislature has not seen fit to enact that any violation of the penal laws shall constitute cruel treatment, but has expressly provided that for none other than those in which the defendant has been found guilty of a felony and sentenced to at least two years in the penitentiary shall a divorce be granted, except for the one misdemeanor of adultery. Both these, however, are made a distinct ground for divorce. The writer can conceive of nothing more distressing or harrowing to mind and body than to be united in marriage to an insane person; yet no General Assembly in Georgia has so reflected on the humanity of our civilization as to insert in our law a provision that insanity occurring after the marriage shall be a ground for divorce. Under our marriage contract husbands and wives still take one an-

other "for better or for worse," and the divorce laws of this State do not confer upon the courts the discretion to annul the contract of marriage in all cases where, from considerations of expediency or by reason of the incompatibility of temperament of the parties, such a course might seem desirable. The defendant in error has doubtless suffered much on account of the unfortunate habit of his wife, but the only bad habit which the law of Georgia recognizes as a ground for divorce is habitual intoxication from the use of alcoholic liquors. It may not be amiss to say, in conclusion, that in making this decision we announce no new doctrines or strange theories. On the contrary, we but declare what has been the law in Georgia ever since Georgia has been. If, upon occasions, this court has seemed to depart from those ancient principles, the effect has not been to change the law, but to stray from it.

*Judgment reversed. By five Justices.*

SIMMONS, C. J. I concur in the reversal of the judgment, on the ground that the habitual use of morphine by a wife is not, under the code, such cruel treatment as will authorize a divorce.