JAMES S. ODOM, plaintiff in error, vs. HARRIET ODOM, defendant in error.

1. The declarations of the wife, when in the act of leaving her husband's house and taking certain articles of household furniture with her, made in the presence of his two sons and others, are admissible in evidence for the purpose of showing and explaining her motives and conduct at the time, although her husband was not present.

2. On the trial of a libel for divorce, the ante-nuptial agreement between the parties is admissible in evidence, for the purpose of showing the source from whence the property was derived, as provided in the Code.

3. Where the defendant, shortly before the separation between him and his wife, had transferred his property by deeds of conveyance to his children by a former marriage : *Held*, that the deeds were admissible in evidence, for the purpose of showing, in connection with other evidence, that the transfers of the property were made with a fraudulent intent.

4. Legal cruelty, which will authorize a divorce under the Code, may be defined to be such conduct on the part of the husband as will endanger the life, limb, or health of the wife, or create a reasonable apprehension of bodily hurt, so as to render cohabitation unsafe.

5. Condor ion is a conditional forgiveness of all antecedent guilt. After a reconciliation, fresh acts of cruelty will revive acts of cruelty and also of adultery. Condonation is not so readily presumed against the wife, as the husband. Knowledge of the guilt of the husband, and forgiveness by the wife, are not legally to be presumed, but must be clearly and distinctly proved, in order to bar her action.

6. Alimony is an allowance out of the husband's estate, made for the *support* of the wife when living separately from him. When the verdict of the jury was in favor of a divorce, a *vinculo matrimonii* between the parties, and they further found for the plaintiff the sum of $12000.00 : *Held*, that the legal effect of the verdict, under the Code, is to vest that sum in her as permanent alimony for her *support* and *maintenance* during her life only, according to her rank and condition in life.

Divorce. Alimony. Sayings of wife. Tried before Judge COLE. Macon Superior Court, March Term, 1867.

Harriet Caldwell, widow, married James S. Odom, widower, 26th January, 1860. They quarreled, and finally separated 4th October, 1865, and she sued for a divorce, a *vinculo matrimonii*.

The libel charged that he had treated he. cruelly, by failing to furnish her proper clothing and the necessaries of life,

by threatening to whip and shoot her, and by violently assaulting and beating her, first on the 8th February, 1865, and again (after she had left him and returned,) on the 11th August, 1865 ; and further, that he had been guilty of adultery with his slave Hester.

The schedule of property filed footed up $39,266.00, which was made up of a plantation, 808 acres, in Macon county, estimated at $5,656.00 ; fifty bales of ginned cotton, estimated at $7,500.00 ; thirty-six bales of cotton unginned, estimated at $4,800.00 ; growing crop estimated at $9,000.00, stock, furniture, etc.

A note to the schedule set forth that by the marriage he got with her $6,000.00 in cash, nine slaves, and the use of thirty-eight or nine slaves in which she had a life estate, that she had nothing but a note on him for $3,000.00, which she was not certain of collecting, and that she believed he had money due to him of which she could give no specific statement.

Defendant plead not guilty, condonation, and that if he had treated her cruelly her bad conduct provoked him to it, and that she was guilty of like cruelty.

She filed a bill restraining him from disposing of his property *pendente lite*, and at the appearance term procured an order for temporary alimony of fifty dollars per month, and for fees for her solicitors for the present of three hundred dollars.

The first verdict was obtained during the first week of the Court, and during the second week the case stood for final trial.

The Solicitors for libelant read in evidence the marriage license and certificate, dated 26th January, 1860.

They then read the answers of C. ALICE HAUGABOOK to interrogatories.  She testified that she was daughter of libelant ; that she, Zebulon Odom and Bunyan Odom were present on the 4th October, 1865, when libelant left defendant's house, but defenda ; was not present.  Libelant then said to the boys that the father had treated her so badly that she could not stay with him any longer, that he had pushed her

out of the door, and ordered her off the place, and took the keys from her.

Defendant's solicitors objected to these sayings of libelant, but they were held to be competent testimony.

She further testified that libelant and defendant lived together unhappily, that it was defendant's fault; that he spoke roughly to libelant, though his words witness did not recollect; that she saw prints of fingers on libelant's arms for two weeks; that defendant would not allow libelant to carry the keys and give out meals; would not allow meat or flour for supper or breakfast, had very coarse fare, and seldom had flour; that he gave plaintiff four calico dresses, about twelve yards of bleached homespun, a part of a bolt of Macon homespun, one handkerchief, three or four pairs of shoes and one Quaker bonnet, that witness knew of since the marriage; that she never knew libelant to have a difficulty with any one but defendant; that defendant once charged libelant with sending a little negro into the field to watch him, and abused her for it.

Upon cross-examination, she stated that she was nineteen years old, not very friendly with defendant, but would not do him injustice; that she was impartial and competent to judge, and thought defendant was blameable; that when her mother left she took off five chairs, two bedsteads, two feather-beds, two mattresses and pillows, some bed covering, though not much, one wash-stand, one wardrobe which was her own, one table, one looking-glass and some dishes; that one of the beds and furniture belonged to the Caldwell children. Defendant was not present; do not know whether he gave his consent. That she had made an affidavit heretofore, but testified without having her memory refreshed, and with no one present besides the commissioners.

They next read the interrogatories of JOSEPHINE A. HAUGABOOK, who said, she was seldom about the house and not long at a time; so far as she knew, libelant did her duty as a wife, and she knew nothing of cruelty by defendant, except that she had seen bruises, like the print of fingers, on libelant's arm; she had never seen but two calico dresses given

libelant by defendant since the marriage, and stated about the same as her sister as to what her mother took away when she left Odom's.   She said she was not present when her mother left, but was just before she left, and heard her mother tell Zebulon and Bunyan Odom that she had tried to live with their father and could not do it.

This remark of libelant was objected to, and the objection was overruled.

Upon cross examination, she stated that she was twenty-three years old, not unfriendly to defendant, did not know who was to blame; did not know to whom the things taken away belonged, only they were in defendant's possession; never heard libelant use any insulting language to defendant; defendant was not present when libelant left; libelant gave witness one dress just after the marriage, which she bought before, and witness' husband gave libelant one brilliants dress.

MARY T. SPIVEY (for libelant,) testified by interrogatories that she was present when Mrs. Odom left in October last; that she took away various articles, (enumerating them substantially as aforesaid,) and that Bunyan Odom said to libelant, "Father said you must not take those cane-bottomed chairs, they are the parlor chairs."

This saying was allowed over the objection of defendant's attorneys.

She testified that she was at Odom's a great deal, knew that Odom and wife did not live pleasantly together, but did not think Mrs. Odom was blameable; that she never heard her speak unkindly to Odom or the children, but did her duty as a wife, treating Odom with kindness and affection; never heard her speak unkindly to him or even to the servants.   She said she had known Mrs. Odom to go from one house to another to speak to defendant, and he would get up and go away and would not answer her or allow her to speak to him; never heard Odom abuse his wife, but he would not let her carry the keys, nor give out any provisions, nor have anything to do with the cooking; he never had any meat for supper or breakfast nor any flour while witness stayed there,

19

unless when they had company, then they had good meals. Mrs. Odom had very few clothes; witness knew that she had but one under-body first of 1866—had seen her pull it off Saturday night and have it washed and dried to wear Sunday. Odom never gave his wife a Sunday-bonnet since they married.

Cross-examined, she said that she was fourteen years old in March, 1866; was libelant's grand-daughter; not very friendly with Odom, but would not do him injustice; that she might not be a competent judge, but thought Odom was blameable; that she did not know to whom the things Mrs. Odom took away belonged, nor whether she took them with Odom's consent; Odom was not present when his wife left; that she had never made any affidavit in this case; no one but the commissioners were present while she answered, and that she had consulted with no one about her answers to the interrogatories.

ANNA V. SPIVEY, whose interrogatories had been taken by libelant, swore that she was present when Mrs. Odom left, and that Zebulon and Bunyan Odom were present; that libelant told the boys that she was going to leave there, that she had tried to live there but could not stand the treatment, and she was going to take something, and told Zebulon to make a memorandum of what she took, which he did.

This remark was objected to by defendant's solicitors, but the objection was overruled by the Court.

She enumerated the articles taken away in substance as did the other witnesses.

She swore that she was not about there much, but thought Odom and his wife did not live together happily, don't know why, but thought Odom was to blame; had seen Mrs. Odom speak to him and he would not answer her; had seen him help all the plates at table and not wait on his wife; he would not allow her the rights and privileges of a wife; would not allow her to carry the keys to the meat-house or store-room; had seen Odom with the keys go to get out dinner; in early part of 1865 she saw bruises on Mrs. Odom's arm that looked like fresh prints of fingers—those bruises

Odom *vs.* Odom.

staid on her a month or more.   Defendant never bought his wife clothing suitable to her station in life; he never purchased but four calico dresses and one handkerchief for her that witness knew.

Cross-examined, she said she was thirty-two years old, daughter of libelant; would not wrong defendant by word or deed, but owing to existing circumstances does not feel very kindly towards him; she thought all the things taken away by Mrs. Odom were purchased by Odom at Caldwell's sale, except the wardrobe—witness and her sister Mrs. Davis gave that to Mrs. Odom.   Defendant did not give his consent to the taking off anything.   She thought she had given the matter an impartial investigation, and thought Odom was to blame; she did not think Mrs. Odom was to blame at all; never heard her use any opprobrious or insulting language to Odom.   All she recollected of what Odom gave Mrs. Odom was one calico dress, one pair of shoes, one or two handkerchiefs, and a pair of gloves.   Mrs. Odom gave witness two yards of calico to make her babe a dress, and that is all witness recollects of her giving to witness.   She stated that she had never made an affidavit in the case, had consulted with no one as to her answers, and that none but the commissioners were present when she answered.

SARAH K. KNIGHT'S interrogatories were next read.   She testified that she had known Mrs. Odom twenty-five years, perhaps longer, and lives about three-quarters of a mile from her.   Mrs. Odom sent for witness to go to her house (either before or since the separation in February, 1865, she did not recollect which).   Odom was there; if he and his wife had any conversation then, witness does not recollect it; does not recollect that Mrs. Odom said anything in Odom's presence or hearing in reference to his improper treatment; she then showed witness a bruise on her arm, but witness does not recollect whether Odom was present.

Cross-examined, she said that she lived three-quarters of a mile from Odom's, in Macon county, and had lived there for many years past: that she could not speak with certainty as to Mrs. Odom's character for amiability, gentleness, meek-

ness, submissiveness, etc., that she knew nothing of Mrs. Odom being suspicious or jealous in her nature, but did know that Mrs. Odom bore the character of a kind-hearted, charitable and clever lady in the neighborhood. During witness' acquaintance with Mrs. Odom, never heard of her being concerned in any improper conduct before her marriage with Odom. Witness is not much of a surgeon or much in the habit of examining wounds; did not know what caused the wounds on Mrs. Odom; was not unfriendly to defendant as a neighbor, and knew nothing more in his favor.

The interrogatories of ADELINE ODOM, a person of color, were offered in evidence, and objected to, on the ground stated in the motion for new trial. The Court overruled the objection, and the interrogatories were read as follows : That she knew the parties ; they did not live happily together ; that some time last year (1865,) Mrs. Odom went to Macon after Louisa, a house-girl, and when she came back she sent a little girl to Odom for the keys, and he would not send them to her. Odom came to the house; Mrs. Odom asked him for the keys to get a broom. Odom said, you shall not have the keys any more, "you old devil." Mrs. Odom then went out to the little house, out in the yard, to get a broom ; Odom went ahead of her, picked up an old axe, and said, "You infernal old devil, I'll have the Yankees to drag you out of my yard directly." Mrs. Odom went back to the house ; she saw Odom push Mrs. Odom about several times in the house ; if Odom was sitting at the table eating, and Mrs. Odom would come and sit down, Odom would get up and leave. Witness had frequently heard them quarreling at night, but don't know what either said ; never heard Mrs. Odom use any bad words to Odom ; it was last year, about July or August, that Odom carried the keys, or when he did not, his children did. Odom said Mrs. Odom should not carry the keys any more, witness don't know why; none of the cloth bought was put under Mrs. Odom's control, it was locked up and she was not allowed any of it ; he had plenty of wheat and flour, but did not allow his wife to use it.

Witness was the washerwoman, and was called into the

house one morning last year (1865), to get the clothes to wash, and Mrs. Odom's clothes were all wet with chamber-lye and besmeared with the dirt of a little child—this was on her gown, night-cap and under-clothes—don't know when it was, but it was a cold, frosty morning.  Mrs. Odom is a good woman; witness was raised with her.

Cross-examined, she said: I am black, live with Mrs. Odom, have lived with her for some time past.  No one ever talked with me about my testimony in this case.  I gave my affidavit before in this case; they called on me to do it.  I then said about the same things I have now said—I think it was Mr. Snead and a tall man with him who called on me for the affidavit—I have not heard it read, nor has any one talked with me about it since.  I then said about the same thing as now; and about flour and cloth she refers to her answers to direct interrogatories; no one told me to say anything about flour or cloth since.  I can't read or write; to tell the truth is what I understand I am now to do.  I never heard Mrs. Odom quarrel with or abuse Odom; don't know her age, but thinks she is sixty or seventy; no one present but the commissioners.

ROSE HAUGABOOK (colored,) was objected to, as in the last case, but the objection having been overruled, she testified by interrogatories that she knew the parties, and that they did not live happy or agreeable after they moved from Dawson; not able to tell why; witness has seen Odom maltreat his wife—saw him push her one time—don't know what he said.  Witness went into Mrs. Odom's room early one morning last fall, 1865, she was sitting on the chair crying, her cap and gown were all wet with urine; the night-glass was setting in the floor empty; witness helped her to strip.  Witness said Odom pushed Mrs. Odom out of doors once; heard them quarrel, but don't know who started the quarrel; don't know what they said in their quarrels, as she always left when she heard them quarrel; they did not eat together as man and wife for several months before they parted; don't know why.  This was last year, (1865).  Odom carried the keys; don't know why Mrs. Odom did not; Mrs. Odom did not have

control of any of the cloth bought or made after their first falling out; she did not get any of the cloth for her own use, as witness knows of. Odom had plenty of flour and meat on the place : before he got mad, he let his wife have plenty of it, afterwards he did not. Witness stated that she had belonged to Mrs. Odom since she was twelve years old.

Cross-examined, she said : I am black; live at John Haugabook's; no one has talked with me about my evidence; have sworn in the case before; I then swore about what I now swear, so far as I remember. I think I said something about the cloth and flour then, if I did not it was because I was not asked about it. I cannot read or write; my affidavit has not been read to me, nor has any one talked with me about it since it was taken. I never heard Mrs. Odom abuse Odom or any of his children any way. I did tell Jackson I was not sworn in this case, and I told him Mr. and Mrs. Odom did not eat together; I told Jackson that I said this to the lawyer—I told him so because he told me if I swore against Odom, Odom would get any of these men round here to shoot me for ten dollars. I thought Jackson came to pick me. None present but commissioners.

JAMES CALDWELL testified that, one morning before day, Mrs. Odom and Odom commenced talking in bed; they got up, and Odom threw a bucket of water on her, and then emptied a chamber-pot on her, then threw a pitcher of water on her, and caught her by the arms and threw her down, and that witness afterwards saw bruises on her arms.

At another time, when old Becky was whipped, Odom and Zeb were standing on the steps, Mrs. Odom came up, and Odom shoved her off the steps, and Zeb said, " Pa, I wouldn't do that."

Upon cross-examination, he swore : I am fifteen years old, Mrs. Odom's son. They were talking in bed; neither talked as if angry; I was asleep when the talking commenced; it was before day, and somewhat dark; they had gotten up before any water was poured on Mrs. Odom. She got the chamber-pot from under the bed, and held it to keep Odom from pouring water on her; said if he poured water on her

she would throw it on him. This was before the first separation in February, 1865. After this occurrence she left him, but came back again ; don't know how long she stayed away.

I was present when Odom whipped Becky, but don't recollect what his wife said when she came up ; she was talking. I was not in Montezuma with Berryman Odom the day Becky was whipped. When she went up on the steps Odom pushed her off, and Zeb said, " Father, I wouldn't do that." When he threw her down on the floor and left the print of his fingers on her arm, it was the same morning he poured the water, etc., on her.

### REBUTTAL.

On the morning when the water, etc., was poured on Mrs. Odom, she did not get up first.

This witness being recalled at defendant's request, swore that he did not, in August, 1865, in the old house at Odom's place tell Berryman and DeKalb Odom that his mother threatened to slap or whip him because he told her she was always quarreling.

ISHMAEL, (colored,) sworn over the objection of defendant, testified that before free he belonged to Mrs. Odom, and after she and Odom married, lived with them. During the marriage (coverture) he saw Odom go into the house of Milly, a mulatto woman, and "have to do with her." Witness was then secreted under the bed, and after Odom got through and went out, he returned and asked Milly if anybody was in there, and she told him that witness was in there, and he then told her to send witness to him, and he made witness go to the well and draw water for him to wash. It was corn-planting time. This was before Mrs. Odom left the first time ; never told her about it till after she left ; never told her till Christmas, 1865.

BEN BRYAN, (colored,) sworn over defendant's objection, said that he knew Hester, a mulatto woman, and that she had a white child; don't know when it was born, but it was while she lived at Odom's, where she had lived six or seven

years before. Odom directed witness to send this woman to him one night, which witness did. She went to him, and they went into a vacant room in the old house together. There were some peas in the room. Witness saw them in the room; Odom was in his shirt-sleeves; don't know what passed between them in the room; witness saw nothing; they were in there ten or fifteen minutes, long enough to have done anything they wanted; no light in the room. She was Odom's slave then, and had to obey his call.

Odom came to the field one day, and told witness he wanted Hester to go and dig roots for him; they went off together to dig roots—when Hester returned to the field she had no roots—don't know what he wanted with roots, no one was sick that witness knew of. Hester went twice with Odom to dig roots.

### CROSS-EXAMINED.

All this happened before the first separation. The old house that Hester went into with Odom was occupied; it was about thick dusk when she went in. Odom frequently came to the field for some one to go with him to dig roots, sometimes other women than Hester would go, and sometimes boys would go; for a considerable distance Odom and Hester were in witness' view when they went after roots, and witness saw nothing amiss.

Witness frequently heard the parties quarreling. Mrs. Odom often watched Odom; followed him one night in her night-clothes to Berryman's house.

### REBUTTAL.

I live with Berryman Odom; never told Mrs. Odom about these things till after final separation. She asked me about it.

ADAM ODOM, (colored,) sworn over defendant's objection, testified that he knew Hester, she lived with the parties at Dawson, and Odom sent her to his place in Macon county before he moved up here; she had a mulatto child; witness

Odom vs. Odom.

don't know when it was born, he was in the war at that time; don't know the child's age; don't know that Odom had anything to do with Hester; knows nothing about it; never saw them in a room or house together.

Here Adam refused to answer questions propounded to him, and was committed to jail for contumacy.

LOUISA, (colored,) sworn over defendant's objection, said she lived with Mrs. Odom before freedom; Odom used to come into witness' bed-room and try to have intercourse with her, offered her one time two dollars to feel her titties; on one occasion, at Dawson, to avoid Odom, she went up stairs and carried the children to sleep with her and locked the door; she heard some one come up in the night, and next morning Odom asked her why she did not come in and sleep in bed with him; she nailed up the windows of her house to keep Odom out; he made these offers to her when Mrs. Odom was from home; don't know age of Hester's child; once saw bruises on Mrs. Odom's arm.

Odom got into witness' window one night, and tried to throw her on to the bed; she told him if he did she'd halloo. She blew up the light to keep him off of her, and he would blow it out.

CROSS-EXAMINED.

She said she lived in Macon, had come down to see her folks and to testify in this case, and that Odom never had connexion with her.

HENRY KAIGLER, (colored,) sworn over defendant's objection, said he saw Odom push his wife twice off the steps and call em "old she-bitch," and told her if she did not leave the place he would kill her and old Beck too.   Mas Zeb say, " Pa, I wouldn't do dat, let em go about her business."   It was fodder-pulling time, year before last.   Knows that Hester had a mulatto child.   Berryman was there.   Knows of no one claiming anything on the place before Mrs. Odom left.   Made twenty bales of cotton there that year, 1865.

### CROSS-EXAMINED.

Berryman and Zebulon were both there when Odom pushed Mrs. Odom off the steps.

ALBERT ODOM, (colored,) sworn over defendant's objection, testified that he lived with Odom two years before freedom ; that he once saw him shove Mrs. Odom out of the door at Berryman's house to keep her from talking with Berryman ; at another time, when witness was beating peaches in 1865, Mrs. Odom went to defendant and asked for the keys to get a broom from a small house in the yard.    Defendant refused to give them to her, and she got an axe and threatened to cut the wooden hinges of the door.   Odom took the axe from her and shook it over her and threatened to kill her, cursing her for an old she-devil or bitch, and said he would make the Yankees haul her out of the yard.   The morning Odom whipped old Becky, he shoved his wife out of doors ; Zeb was there, and asked him not to do that.

### RE-EXAMINED.

When he shoved her out of the door about old Becky, Berryman and Zebulon were there, and Miss Odom and her grand-mother and Mr. Odom.

Plaintiff then tendered and read in evidence a receipt from Odom to Abner Burnum, administrator of John J. Hauga-book, for $362.50, dated 5th February, 1861, in full payment and satisfaction of all Odom's claim in Haugabook's estate in right of his said wife, who had been Haugabook's wife.

After proving by the Ordinary that search had been made in his office by counsel, that inquiry had been made of John Davis, administrator of Burnum for the originals and that they could not be found, plaintiff read in evidence two copy receipts, by one of which, dated 14th December, 1861, de-fendant acknowledged that he had received from Burnum, administrator of James S. Caldwell, nine negroes therein named, valued at $5,282.00, 256 bushels corn and 500 pounds fodder, valued at $382.50, being defendant's proportionate share of negro property, and that day divided ; and by the

other of said receipts, dated 1st May, 1861, defendant acknowledged the receipt from said Burnum, administrator of said Caldwell, of $6,168.30, an antenuptial marriage settlement between Harriet Caldwell, James S. Odom and Ichabod Davis, executed 26th January, 1860, whereby the life-estate of said Harriet, in and to forty-two slaves, under the will of her father, George Kaigler, deceased, was conveyed to said Davis, in trust, for the sole and separate use of said Harriet, free from and in no event to be subject to the judgments, debts, contracts or liabilities of or against said James S. Odom, with the further stipulation that if said Harriet should thereafter desire to make any advancements of any of said negroes to any of her children, that she should be allowed to give each of them a negro apiece as they came of age or married : *Provided,* that if any of the negroes given to the children died, she might advance another in lieu thereof, by and with the consent and satisfaction of the said trustee.

Defendant objected to said receipts and to said marriage settlement when offered, upon the grounds stated in the motion for new trial, and the objections were overruled.

JAMES A. SPIVEY testified that Odom got possession of the negroes about one year after the marriage of the parties. Mrs. Odom gave one of them to witness' wife, and another to another of her children, and so far as he knew had not parted with any of the others. Odom had possession of the nine negroes since the division of Caldwell's estate—in all, there were about thirty-five working hands. After deducting all expenses, the negroes were worth for hire in greenbacks, payable now, $3,500.00 *per annum.*

Defendant owned prior to the separation, and witness supposed at that time, (for up to that period he observed no change in the management of the place,) a plantation in Macon county, containing eight hundred acres, worth fifteen dollars per acre ; the horses and mules mentioned in the schedule he thought worth in October, 1865, from $150.00 to $175.00 per head, and the carriage about $350.00. Witness knew nothing of the other articles mentioned in the schedule,

Odom *vs.* Odom.

as he had little to do with Jim Odom since he entered the family.

WARREN W. DAVIS testified that the negroes went into Odom's possession; that he, as trustee of Mrs. Odom, held a note of about $3,000.00 on Odom, and a note made by Mrs. Odom previous to her marriage for about $2,500.00 principal and interest, which was paid by Odom in Confederate money, in February, 1865, which money was then seventy for one in gold. In October, 1865, Odom had at home about eighty-five bales of cotton; thinks Odom told witness he had twenty-five or thirty bales more at Eufaula; thinks the land worth about thirteen dollars per acre in October, 1865, and the mules and horses then on the plantation worth $125.00 per head, farming utensils, household and kitchen furniture, worth $700.00 or $800.00, carriage and buggies worth $500.00, ox-cart $40.00. The $6,000.00 receipt given to Burnum was for Mrs. Odom's distributive share in Caldwell's estate. Hester's child was born in early part of 1865, either just before or just after the separation. Witness distilled bout forty gallons of peach brandy for Odom, worth $8.00 per gallon.

### CROSS-EXAMINED.

Owing to the unsettled state of the country, the land is not worth now over five dollars per acre; don't think any land now would bring five dollars per acre. In fall of 1865 saw Odom sell a lot of damaged cotton, don't know how much, at eighteen or twenty cents. The price of cotton here since that time has fluctuated from forty-one to eighteen cents—now worth about eighteen cents. The emancipation of the slaves made the crops poor for want of steady and efficient labor; the negroes were free after April, 1865, and Odom had to hire them to make the crop of that year, and this increased the expense of farming; thinks the net profits of the negroes while slaves about $2,500.00 or $3,500.00 *per annum.* Odom has five or six children.

REBUTTAL.

Odom sold about two wagon loads of cotton in October, 1865. The note witness holds as trustee for Mrs. Odom, on Odom, is $3,084.00, dated 27th February, 1865.

ADAM ODOM, (colored,) brought from the jail and introduced, testified : Odom and Hester were on the bed together twice up here in Macon county and once in Dawson; it was at night, in the negro-house where Hester lived, and since he married Mrs. Odom; the time at Dawson, was before witness went to the war, five or six years ago.

CROSS-EXAMINED.

The first time up here, was just before witness went to the war; and the last time, after he returned from the war. Witness was after the woman himself, and when Odom came in witness hid under the bed. Odom did not, but Hester did know, that witness was there.

REBUTTAL.

Never told Mrs. Odom about it until after the second separation, when she sent for him and asked him about these things; lives with Berryman Odom, at the Odom place.

EVIDENCE FOR THE DEFENDANT.

B. B. ODOM testified that in 1861, in Terrell county, plaintiff abused defendant about having negroes whipped, and about a month after that she raised another quarrel and had a disturbance with him about whipping Becky (negro). Soon after this witness went to the war, and did not return till 1863 ; then she quarreled with defendant, and abused him, and told him to go and sleep with another old negro woman named Hannah, and accused him of adultery with the negro women on the place. Witness' furlough was out; he went back to army and did not return home till 1865. Plaintiff, between the first and second separations, abused defendant and accused him of adultery with every negro woman on the

plantation who would allow it: she accused him of adultery with Hester, and abused him about being the father of Hester's child. She always commenced these disturbances, and invariably followed defendant up; she followed defendant to witness' house, went into the house in her night-clothes, and accused witness of having a negro woman there for his father.

Witness was present at the scene about the axe; he had the boy Albert beating peaches; plaintiff came and took an axe, saying she intended to cut down the door and get a broom, and that she would destroy everything on the plantation; defendant took the axe from her, laid it down, then unlocked the door and handed her a broom, which she took and burnt up; defendant did not treat her with the least violence, or threaten her, but asked her to go into the house and behave herself, and let him have some rest.

Was present at the old house when she came there and commenced abusing witness (Berryman) about the business; defendant did not push her out of the door, but took up his hat and walked off; defendant asked her to go away and let them alone; she called witness a puppy, and Odom an old dog; accused him of having intercourse with the negroes, and told the children that Hester's child was their sister; this was in July, 1865. Witness was not present when Becky was whipped in 1865; the day she was said to have been whipped witness and James Caldwell were in Montezuma, and neither of them saw anything of the whipping. James Caldwell said to witness at the old house, in August, 1865, "Mother liked to have got me because I asked her what she quarreled with Mr. Odom so much for."

Odom has six children; don't know whether the youngest son is twenty-one years old; three of these are of age, two daughters under age; at the time of separation, defendant had sheep and cattle down the country (don't know how many), and some sheep up here; had one horse, a note on Zebulon and B. B. Odom for over $11,000.00, some other notes, one on Way, of Dooly, for about $160.00, which witness does not consider worth much, a note on Captain Turner,

considered worthless; Turner says he cannot pay more than ten cents on the dollar.

At the time of separation, all of defendant's property was not worth more than $12,000.00 or $13,000.00; he was indebted several thousand dollars, and has been compelled to expend about $2,000.00 in consequence of this case; has paid $300.00 to Mrs. Odom's counsel, $50.00 per month alimony to her since 23d October, 1865, besides $900.00 for which he has become responsible to his counsel; defendant lost heavily by the war; had horses and provisions impressed; had claims on Confederate Government, together with Confederate bonds and notes; losses in this way, not less than $10,000.00.

At the time of separation, there were on the place only fourteen horses and mules, which would not have sold for over $100.00 apiece on an average; he had about half a barrel of peach brandy; the growing Cuba cane belonged to the negroes, and was worth very little; he had a single ox-cart, worth not over $20.00, one carriage, worth $250.00 or $300.00, one buggy, $80.00, three negroes, considerably dilapidated, and worth $150.00, farming utensils and household and kitchen furniture, which witness cannot estimate, about thirty head of cattle, worth $6.00 per head (for which witness sold them), seven or eight head of sheep, worth from $1.50 to $2.00 per head, twenty or twenty-five goats, worth seventy-five cents apiece, ninety or one hundred head of stock hogs, which would average $3.00 apiece, from sixty-five to seventy bales of cotton, averaging four hundred and fifty pounds; there were eighteen bales of cotton made on the place in 1865, of which two or three bales were impressed by the Yankees to pay the negroes; defendant had thirteen hundred bushels of corn above the share of the laborers; the sorghum syrup mentioned in the schedule belonged to the negroes.

Witness was, but defendant was not present when plaintiff left; plaintiff said, when she left, that she had a letter from General Warren advising her to leave there; she carried off an ox-cart and a two-horse wagon load of things when she

Odom *vs.* Odom.

left; defendant had notice of her intention to leave; she commenced moving in the evening and stayed there till dark.

At the time of the separation, the land belonged to Zebulon Odom, and not to defendant; the personal property, except such as was reserved, was turned over to witness and Zebulon Odom, under a sale made to them in September, 1865; It was in July or August, 1865, that plaintiff went to Macon to see about a free negro (Louisa) who had gotten into trouble; during her absence defendant took possession of the keys, and on her return did not give them up to her, because she frequently threatened to destroy everything on the place; in the sale made to witness and Zebulon, the cotton was bought by estimate, because it was only partially ginned and packed; it was estimated at sixty bales; the sale took place a month or six weeks before plaintiff left; the purchasers went into possession and took control immediately on the sale.

### CROSS-EXAMINED.

Negro Hester and child have not been at Odom's since witness' return, in April, 1865; were not there now and have not been since; witness did not anticipate a separation between the parties; witness sold and traded off some of the horses; defendant reserved enough provisions to supply his family until the January after the trade, also, the right of residing on the place, the household and kitchen furniture, one buggy, one mule, and one horse, the stock that was absent from the place, and some other things; the sale took place in September, and defendant left in October; defendant has no interest in a saw-mill at St. Mary's; in consequence of the sickness of Zebulon Odom, defendant went to the mill last September to take Zebulon's place, and returned here last Sunday; witness and Zebulon at the close of the war were worth about $1,000.00; have paid a part of the note given by witness and Zebulon.

Defendant planted in 1865 three or four hundred acres in corn; (may have sworn in answer to bill filed against him and others that there were five hundred acres;) the crop was

a poor one; wagons, oxen, and cart worth $250.00; defendant stated to witness that he had thirty bales of cotton in Alabama, included in sale to witness and Zebulon; defendant reserved nothing else besides the articles enumerated, except the cotton in Alabama that witness recollects. Mrs. Odom, when she left, said "she was going because she had tried to live there bat couldn't do it, Odom treated her so badly; that she was going to take some things with her, and she wished Zebulon to make a memorandum of them." This was objected to, on the ground stated in the motion for new trial, and objection was overruled. If Zebulon made the memorandum, witness does not know it. Witness understood that defendant made a deed of gift to Zebulon and witness of certain negroes in trust for defendant's children, but witness was absent when it was done. This was objected to by plaintiff, and objection overruled. All the negroes embraced in the deed of gift to Warren W. Davis as trustee are included in the copy deed last mentioned, (which was then exhibited to the witness).

No one but the parties were present at the sale of the personal property of defendant to witness and Zebulon.

#### REBUTTAL.

Think all the cotton was ginned, but not packed at the time of the sale; deed of gift to Zebulon and witness was never delivered to witness, and he does not know that it was ever delivered to any one; of the cotton sold by defendant to witness and Zebulon, thirty or forty bags were stained, or storm cotton, sold at from twenty to twenty-five cents.

ZEBULON J. ODOM testified that from 1861 to 1865 he was absent most of the time in Army of Northern Virginia; left in latter part of June, 1861; returned on furlough for a short time in December, 1863, or January, 1864, and was again at home in the latter part of 1864, or early part of 1865; left home last time 7th February, 1865; plaintiff on all these occasions quarreled with defendant, and greatly abused him in January and February, 1865; she accused him of

stealing a dog-hide from one of the negroes, of being the father of Hester's mulatto child, of adultery with other negroes, and especially with Milly; this was before the first separation; witness got home from the army finally in latter part of April, 1865, and for a month or two thereafter the parties got along amicably, and seemed to live together happily, but after that there was an incessant storm; witness never knew defendant to commence a quarrel with plaintiff, he used every effort to avoid it.

Plaintiff came one morning to the piazza, where witness and defendant were and commenced abusing defendant about whipping negro woman Becky; plaintiff said the negro was going to report him, and she would help her, and hoped the Yankees would punish him; she continued to abuse him about having intercourse with negro women, called him an old drunkard, said he would fill a drunkard's grave, and so would his children. Defendant bore with her some time; asked her to go away and let him alone; told her if she did not he would put her out of the house; he laid his hands on her, and removed her as gently as possible; the steps were low, and she was not handled roughly; no more force was used than was necessary to remove her; she remarked she wished he had thrown her down. She missed no opportunity to abuse defendant till she left. Witness never knew of defendant touching plaintiff after that. Defendant was absent when she finally left his home. If James Caldwell was present the morning Becky was whipped witness did not see him, and does not think he was there.

After Mrs. Odom went to Macon for Louisa in July, she was not allowed to carry the keys; this was, as witness thinks, because she had threatened to destroy everything on the place. When witness returned, in April, 1865, Hester was living at Jerry Walter's, and did not live on the place afterwards.

Adam returned about the same time witness did; witness met him on his return in Atlanta; witness has known Louisa since 1861; her character for chastity is not pure.

Generally defendant would seek to avoid quarrels and

difficulties with plaintiff; she usually addressed him in a loud, harsh, and angry voice; she had plenty of provisions, and appeared to have plenty of clothing; heard her after the war trying to sell a dress (think it was a silk dress) to a negro boy Henry.    Last September, or early part of October. defendant had thirty-two bales of cotton in Alabama; don't know how much stock he had at home, or how much in Worth County; had household and kitchen furniture, held a note on witness and B. B. Odom for $11,800.00; also, a note on Way & Felder for about $100.00; the thirty-two bales of cotton, worth at that time $135.00 per bale.    Defendant's indebtedness at that time was about $7,000.00; thinks defendant lost about $9,000.00 by Confederate securities, &c.; thinks profit of farming during the war, after paying expenses, was very little, if anything.    Defendant's total expenses in this case, including fees and alimony, witness thinks about $1,800.00.    Defendant has six children, the youngest son of age; two of the children are under age, and four of them had nothing advanced and no provision made for them.

Witness offered in August, 1865, to sell the eight hundred acres of land deeded to him by defendant for ten dollars per acre, but could not get that; considers five dollars per acre a fair estimate of its value now.    There were on the place about a half dozen sheep (at the separation), worth $1.00 apiece, one hundred hogs, worth $5.00 apiece (not certain as to this); also, sixty-five or seventy bales of cotton; in 1865, about five hundred acres planted in corn and about sixty in cotton made from fifteeen to twenty bales of cotton; not corn enough to furnish the place longer than June; very little sorghum syrup on the place; some fourteen or fifteen horses, worth on an average $125.00 each; wagons, worth $200.00; carriage and one or two buggies; thinks buggy, which was sold for $60.00; single cart worth $20.00; don't know value of Cuba cane or peach brandy.

At time of separation, everything on the place belonged to witness and Berryman Odom, except household and kitchen furniture, one horse, one buggy, one mule, and some other small matters; the purchase was 17th September, 1865, when

everything sold went into possession of purchasers; purchase money was $11,800.00; thinks that between $4,000.00 and $5,000.00 of this amount has been paid.

Witness was at home when Hester's child was born; thinks it was on the 6th February, 1865, but is not certain. The land was given to witness and the deed executed and delivered 4th February, 1865. In the spring or summer of 1864, defendant spoke of giving this land to witness, and in December, 1864, finally concluded to give it to him. Defendant is fifty-four years old; has no profession, and apart from the means in his possession, no way of making a support except by digging for it. Plaintiff had no children by defendant.

### CROSS-EXAMINED.

Hester has had a mulatto child since the marriage of plaintiff and defendant; defendant left here in September last to take witness' place in the mills; witness' place at the mills was to manage the finances.

Witness made no arrangement with defendant for compensation; defendant made no charge for his services, but witness expects to pay him what is right; defendant has no interest in the mills; they belong to Z. J. Odom & Co.; the other members of the company are Berryman Odom and Van Valkenburg, each owning one-third; cost $20,000.00, and are indebted $7,000.00; defendant left the mills about a fortnight ago. When plaintiff left, she asked witness to take a memorandum of the things she carried off, which witness did; does not remember whether he now has the memorandum or not; it may be at home; the other witnesses have given a pretty correct list of the things carried off, except that plaintiff took a large chest containing her clothing.

Since making a calculation, the fees, alimony, and other expenses in this suit, amount to $2,100.00; defendant owes his mother some $5,000.00; he had money of hers, and the use of her negroes; besides that, he owes other debts; defendant gave up the personal property on the place to witness and his brother at time of the sale.

### RE-INTRODUCED.

Knows Adam's general character; it is bad, and witness would not believe him on oath in a Court of justice; says the same as to Ishmael, and of Louisa that her general reputation is not good.

### CROSS-EXAMINED.

Would not believe them because the two former are notorious rogues and liars, and the latter a whore.

ADAM ODOM, colored, at the instance of defendant, testified that he did not tell Bunyan Odom in his (witness') yard last week that he never saw defendant have anything to do with Hester, that all he knew about the matter was seeing defendant push plaintiff out of the door.

Z. J. ODOM, re-introduced, testified that about the last of October or first of November, the cotton was shipped to New York and sold; thinks this was before he and Berryman were made parties to the bill by complainant in this case. The first he knew of quarreling between the parties was in 1861. Mills cost $20,000.00; in debt $7,000.00; owned jointly by witness, Zebulon Odom, and Van Valkenburg, each one-third. Defendant owed about $5,000.00 to his mother for property, use of negroes, and money he got of her; she had some six negroes; defendant had the use of her negroes and other effects about twelve years; they never had any settlement of their accounts, and the amount of the indebtedness is not ascertained; defendant's mother lived with him during that time, but her support would not consume the income of her property.

Addition to Z. J. Odom's testimony, as shown by the brief of evidence. In 1864, when defendant talked about giving the land to witness, nothing was said about troubles between plaintiff and defendant; witness and Berryman bought the carriage; neither of them then was married or had any children. Plaintiff has two children by Caldwell, her former husband,—James, about thirteen years old, and a little girl

about eight years old.    Witness's sisters live on his place,—they are to pay board, don't know what the price will be. Commenced building mill in January, 1866, and completed it in August, 1866.  At time of purchase, witness and Berryman, (besides the land given witness by his father,) were worth each, only $350 in a note on defendant, and a shot-gun.

B. B. Odom, re-introduced, testified he returned from war last of April or first of May, 1865 ; Adam returned soon after ; when witness returned, Hester was living at Jerry Walters', eight or nine miles off; never saw Hester on the place after that ; she had no house or abode there ; Adam remained till next Christmas, for next twelve months, at witness' return ; Hester never spent a night there ; Hester was there last Christmas.   Knows Adam and Ishmael ; their general reputation bad, and he would not believe them on oath.   Knows Louisa and her general reputation ; it is not good ; it is doubtful about believing her.   Adam told witness in his (Adam's) yard last week, that he knew nothing about defendant having anything to do with any women, and all he knew about the matter was defendant's pushing plaintiff out of the door.

#### CROSS-EXAMINED.

Don't know when Adam went to the war, as witness was absent at the time.   In 1865, after returning, witness did not spend more than one or two nights from home ; was watchful and vigilant to prevent thieving, and thinks no strange person could have spent a night there without his knowledge.

JESSE WALTERS testified that he knew Hester ; in spring of 1865 she went to Jerry Walters' to live, and stayed there till Christmas ; knows nowhere else that she lived that year.

#### CROSS-EXAMINED.

Jerry Walters lives six or seven miles from Odom's ; Hester could have gone there at night, and may have done so, but witness does not know that she did.

MILLY (colored) testified that she had known Ishmael

four or five years; never found him in the house when she sent him to defendant; Ishmael never had anything to do with her; Odom never had anything to do with her at any time.

CROSS-EXAMINED.

Hester has mulatto child about two years old; witness does not know its father; witness lives with Berryman Odom.

Miss JENNIE ODOM testified that she was defendant's daughter and had lived with him most of her life. When they lived near Dawson, defendant whipped the nurse; plaintiff came to him very mad and abused him; don't recollect the exact time. After moving up here, plaintiff quarrelled with defendant frequently, and always commenced the quarrels. Witness was at school at both separations; heard them quarrel a great many times before and after the first separation. Witness thinks she was at Perry at school, when her brothers came from the war. Plaintiff's conduct was very unkind to defendant; his was kind to her. When plaintiff commenced quarreling with him, defendant would walk out of the house and leave her. Witnessed this treatment in summer, when she came home from Perry.

At first, plaintiff was kind to defendant and his children, and this was so till Miss Lizzie Davis, her daughter, (here in Court,) came down to Dawson on a visit, and she and her. mother had a quarrel; from that time, plaintiff's conduct changed, and towards defendant and his children, was very unkind. When plaintiff and defendant were married, she brought with her cloths, and made them up for defendant's children. Plaintiff was amply provided with food and clothing by defendant; remembers but two homespun dresses worn by plaintiff during the war; witness and her sister wore homespun. Defendant never took the keys from plaintiff; she went to Macon, and the keys were not returned to her afterwards.

Miss INDIANA ODOM testified, that while they lived near Dawson, plaintiff frequently quarrelled with defendant; al-

ways commenced it, and abused him violently. Once she abused him greatly; he begged her to stop; she grew worse; he got up exclaiming, "Oh! my poor children—what will become of them;" took his pistol, started out, saying he would kill himself; a faithful negro followed and brought him back to the house.

After they moved to Macon County, she quarrelled with him almost incessantly; before going to Macon after Louisa, she stood on the steps, rattled the keys in her pocket, and threatened to destroy everything on the place; said, by Christmas there should be nothing in the smoke-house; threatened to have the gin-house burnt. Plaintiff supplied her with food and clothing as well as he could; she told him to buy nothing till he got out of debt; she did not treat witness and defendant's other children, and witness's grandmother (a very old lady) kindly, but quite the reverse.

### CROSS-EXAMINED.

After Mrs. Davis's visit, plaintiff's conduct changed to defendant's children. She would make cakes and delicacies for her children, and give none to defendant's children.

DeKalb Odom testified, that he was twenty-one years old in November last. In 1860, '61, '62 and early part of '63, the parties lived at or near Dawson. During that time plaintiff often quarrelled with and abused defendant. Before Mrs. Davis's visit, she had been kind to defendant and his children; after that she changed, was not unkind, but not motherly. Frequently heard plaintiff quarrel with and abuse defendant; he would try to avoid her, but she pursued him with abuse, and would not let him alone. Between the separations, she abused him violently; he tried in vain to pacify her; she would commence on him on his approach, and abuse him as long as in her presence; heard her refuse to take the keys,—said when she wanted to go into the smoke-house, she would break down the door.

Witness returned from the war in May, 1865. Adam was then there; don't remember seeing Hester; she may have

been there; thinks she was, but is not certain. Know-Adam's and Ishmael's general character, etc.; would not believe them on oath; would not believe any negro.

### CROSS-EXAMINED.

Defendant has no interest in the mills; took no control on the place after sale to Berryman and Zebulon.

———— EITSEN testified: was present in summer of 1865, when Odom, Spivey and witness and two Yankees were at Odom's to punish Adam for being concerned in stealing some wheat. Plaintiff quarrelled with defendant about this transaction; told defendant they should not whip Adam; ordered Adam to follow her into the house, and said he should not be whipped by a parcel of hoosiers. Adam's general character is bad—would not believe him on oath, nor would he believe any other negro.

Defendant read in evidence, certain *ex parte* affidavits of Adelia Odom, Rose Haugabook, Albert Odom and Adam Odom, taken and filed in the case, and closed.

Plaintiff then read in evidence the note given by defendant for $3,080, to Warren W. Davis as trustee for plaintiff, dated 27th February, 1865; also a copy deed from defendant to Zebulon Odom and B. B. Odom, dated 17th December, 1864, conveying in trust for themselves and the other children of grantor, certain slaves therein named, which deed was attested by John C. Riddle and George W. Fish, and acknowledged by grantor before John M. Greer, clerk, and recorded in his office 7th February, 1865; also a trust deed from defendant to Warren W. Davis, dated 27th February, 1865, conveying to Davis in trust for plaintiff, one-half of the negroes embraced in last-mentioned deed, subject to her absolute disposal by will or otherwise, which deed was recorded 3d April, 1865; also copy deed of gift from defendant to Zebulon J. Odom, for eight hundred acres of land in Macon County, executed 4th February, 1865, and recorded 6th February, 1865. This deed purports to have been made in Macon County, and was

attested by L. M. Roberts and John C. F. Clark, clerk Superior Court, Terrell County.

WARREN W. DAVIS, recalled, testified: that the trust deed and note of 27th February, 1865, were given, and the payment of the note held by him was made as a compromise of the difficulties between plaintiff and defendant; that they had been separated, but then they lived together till the last of September or first of October, 1865.    At the compromise, defendant promised if plaintiff would return, to treat her kindly.

WILLIAM H. HARRISON testified: he was in New York last winter, and met defendant there, and asked him what brought him there, and defendant said, "I have come to make arrangements for my mills in St. Mary's."

### CROSS-EXAMINED.

It is customary for clerks, overseers and other agents to speak of principal's property in their control, as theirs, without intending to assert title thereto; don't know that Odom meant he owned the mills.

It was conceded that the witnesses testified that they did not know of plaintiff's having any knowledge of the various conveyances from defendant to his children, or of the sale of the personal effects by him to Zebulon J. and B. B. Odom.

The evidence being closed, the Court charged the jury among other things, as appears by the motion for a new trial.

The jury found the usual verdict for divorce *a vinculo matrimonii*, and "that said libelant do recover from said defendant, ($12,000) twelve thousand dollars," etc.

Defendant moved a new trial upon the following grounds:

1st.  Because the Court erred in admitting in evidence, plaintiff's sayings at time of last separation, in defendant's absence, because it was "*res inter alios acta,* and because defendant was absent.

2d.  (This was objection to the colored witnesses because of color, and was abandoned in Supreme Court.)

3d.  This was as to the copy receipts, and was here abandoned.

4th. Was as to the antenuptial agreement, and was here abandoned.

5th. Because the Court erred in admitting evidence of the transfers of property from defendant to his children, before the separation.

6th. This applied to the deed from Odom to Davis, trustee, and was here abandoned.

7th. Because the Court erred in charging the jury that throwing water on libelant, if done without provocation, was cruelty, and that if the wife was guilty of like conduct, her right to a divorce would be barred, yet that in such a case her conduct, to justify this treatment, must have been extraordinary and extreme; that opprobrious and abusive language would not justify such conduct; and erred in summing up this head, by omitting any allusion to the fact or any reference to the same, that plaintiff had introduced the chamber pot into the contest,—the attention of the jury not having been called to all the facts and circumstances attending the transaction, as well those in extenuation and excuse, as those in aggravation. (All the evidence was referred to the jury, and no part of it commented on except to tell them if they believed from the evidence, etc., as aforesaid. *Note by the Judge.*)

8th. Because the Court erred in charging the jury in reference to condonation; that plaintiff must not only have known the conduct of defendant, which it is claimed she pardoned, but that she must have been able to prove it; and that suspicion or belief of the conduct without ability to prove it, coupled with subsequent cohabitation, would not amount to condonation.

9th. Because the Court erred in charging as to alimony, that while the jury had no right to assign anything to plaintiff's children by a former marriage, yet they might consider the source from which the property came and their dependence on her, in fixing the alimony,—both because that is not law, and because there was no evidence as to the pecuniary condition of her children.

10th. Because the finding of the jury is contrary to law and without evidence to support it, and strongly and decidedly against the weight of evidence.

11th. Because the allowance of permanent alimony by the jury, is unlawful in this: that the amount is given to libelant generally and in fee-simple; that it is so excessive, and so strongly and conclusively against the weight of evidence, as to show improper bias or gross misapprehension on the part of the jury, and as to shock both the understanding and moral sense.

The Court overruled this motion, and his refusal to grant the new trial on said grounds, is assigned as error.

SAMUEL HALL, GEORGE W. FISH, COBB & JACKSON, for plaintiff in error, made the following points, based upon the authorities cited:

Testimony of *servants* unreliable. 1st Eccl. R. 211, Waring vs. Waring; 3 Eccl. R. 335, D'Aguilar vs. D'Aguilar.

As to condonation, see Code §1673; 7th Eccl. R. 389, 380, Dillon vs. Dillon; 6th Mass. R. 147, anon.

What is cruelty which is good ground for divorce, etc. 1st Eccl. R. 211, *ante*, 2d Eccl. R. 163, Best vs. Best; 4th Eccl. R. 454, Holden vs. Holden; 312, ib., Evans vs. Evans; 8th New Hamp. R. 307, Poor vs. Poor; 24th Ga. R. 238; 29th Ga. R. 718.

Opprobrious words justify an assault. Code §§4271–4576.

Sayings of Mrs. Odom not *res gestæ.* Code §3696; 3d Ga. R. 513, Carter vs. Buchanan.

Settlement bars alimony. Code §1694; 25th Ga. 186, Killian vs. Killian.

The verdict is wrong because *it* vested absolutely in the wife, the sum found. Cobb's Dig. 225; Code §§1676, 1693, 1688, 1697, 1699, 1677, 1678, and Killian vs. Killian *ante.*

ELI WARREN, F. T. SNEAD and W. H. ROBINSON, for defendant in error, furnished no briefs.

Odom *vs.* Odom.

WARNER, C. J.

The error assigned in this case is the refusal of the Court below to grant a new trial upon the several grounds specified in the motion therefor.

1. Because the Court erred in admitting the declarations of plaintiff when about to leave her husband's house, in his absence, as testified to by Alice Haugabook, Josephine Haugabook, Mary T. Spivey, and Anna V. Spivey. It appears from the record, that when the plaintiff left the house of defendant, she took with her certain articles of furniture, and that the two sons of the defendant were present when she left, but the defendant himself was absent. This evidence was admissable for the purpose of explaining her motives and conduct, when in the act of leaving and taking the articles of furniture with her. See 3694th section of Code.

2. Because the Court erred in admitting in evidence the antenuptial settlement between the parties. This evidence was properly admitted for the purpose of showing the *source* from whence the property was derived, contained in the schedule. See 1676th section of Code.

3. Because the Court erred in admitting the evidence of the transfers of defendant's property to his children by a former marriage, shortly before the separation of the parties. The transfers of his property by defendant, were alleged to have been fraudulent as against the rights of the plaintiff, and were therefore properly submitted to the jury as evidence conducing to prove that fact, in connection with other evidence which the plaintiff might think proper to introduce.

4. Because the Court erred in its charge to the jury, as to what constitutes "cruelty," under the law. In view of the various grades and conditions of mankind in society, it is extremely difficult to assert any definite rule, applicable to all classes of society, as to what will constitute legal cruelty. Legal cruelty may be defined to be, such conduct on the part of the husband, as will endanger the life, limb or health of the wife, or create a *reasonable apprehension of bodily hurt.* What must be the extent of the injury, or what particular

acts will create a reasonable apprehension of personal injury, will depend upon the circumstances of each case. The acts of cruelty must be such as to render cohabitation unsafe, or are likely to be attended with injury to the person or to the health of the wife. Evans vs. Evans, 4th Eng. Eccl. Rep., 312; Westmeath vs. Westmeath, ibid 270.

In view of the facts contained in this record as to the conduct of the defendant towards the plaintiff, there is no error in the charge of the Court to the jury, upon the question of cruelty.

5. Because the Court erred in charging the jury on the question of condonation. The 1673 section of the Code declares that "If there has been a *voluntary condonation and cohabitation,* subsequent to the acts complained of and with *notice thereof,* then no divorce shall be granted." We think that the charge of the Court, as given upon the state of facts disclosed by the record, was substantially correct. Condonation is a conditional forgiveness on a *full knowledge* of all antecedent guilt. Bramwell vs. Bramwell, 5th Eng. Eccl. Rep. 232. After a reconciliation, fresh acts of cruelty will revive acts of cruelty, and also of adultery. Worsley vs. Worsley, 6th Eng. Eccl. Rep. 249. Condonation is not so readily presumed against the wife, as the husband. Knowledge of the guilt of the husband, and forgiveness by the wife, are not legally to be presumed, but must be clearly and distinctly proved, in order to bar her action. Durant vs. Durant, 3d Eng. Eccl. Rep. 319.

After carefully reviewing the several grounds of error assigned to the rulings of the Court below, we find no legal ground upon which (in our judgment) a new trial ought to be granted in this case, and the only remaining question for us to decide is, what is the legal effect of the verdict of the jury as to the sum of money awarded to the plaintiff. By the 1676th section of the Code, it is provided that a schedule of the property shall be filed, and that "the jury rendering the final verdict in the case may provide *permanent alimony* for the wife, either from the *corpus* of the estate, or *otherwise,* according to the condition of the husband, and the source

from which the property came into the coverture." The 1688th section of the Code declares, that "*alimony* is an allowance *out of the husband's estate*, made for the *support* of the wife when living separate from him.   It is either temporary or permanent."   *Permanent alimony* is granted in the following cases:  First, of *divorce*, as considered in section 1676 ; second, in cases of voluntary separation; third, where the wife, against her will, is either abandoned or driven off by her husband—Code, section 1693.   Alimony is that allowance which is made to a woman for *her support* out of the husband's estate.   It is generally proportioned to the rank and quality of the parties.   1st Bl. Com., 441.

By the old law, as it stood at the time of the adoption of the Code, the property was to be equally divided between the children of the parties, unless the jury should think proper to allow either party a part thereof.  Cobb's Dig., 225.  The Legislature, at the time of the adoption of the Code, must be presumed to have known what the old law was upon this subject. The term "alimony," as expressed in the Code, is therefore to be construed in its legal technical sense.   Permanent alimony is to be granted to the wife only in three cases—First, where there is a total divorce; second, in cases of voluntary separation; third, where the wife, against her will, is either abandoned or driven off by her husband.   In each of the cases enumerated, permanent alimony is allowed for the *support* of the wife out of her husband's estate.   In case of a total divorce, is she entitled to anything more ?   Does the verdict of the jury in this case vest in the wife the absolute interest in the twelve thousand dollars, under the provisions of the Code, or does it vest in her that amount as *permanent alimony* out of her husband's estate for her *support* and *maintenance during life*, according to her rank and condition in society ?   When we look to the 1697, 1698 and 1699th sections of the Code, regulating permanent alimony in the other two specified cases, the intention of the Legislature is clearly manifested in regard to *permanent alimony*.   Our conclusion, then, is, that it was the intention of the Legislature that, in cases of total divorce, the jury might provide permanent ali-

mony for the wife, either from the *corpus* of her husband's estate, or otherwise, and that permanent alimony means a suitable provision for *the support* and *maintenance* of the wife, out of her husband's estate, during her life, according to her rank and condition in the community in which she resides.

This construction of the Code, it is said, will operate harshly in this case, because the husband derived most of his property from his wife : still, it was *his property,* and the provision is made for the wife out of *his estate.* But suppose the husband had acquired no property by his wife, yet she is entitled to permanent alimony out of *his estate* for her support and maintenance during life ; but would it be just and equitable at her death that the *corpus* of the property provided as permanent alimony for *her support and maintenance out of her husband's estate* should go to her legal representatives instead of her husband or his legal representatives, when she had brought nothing into the family ?

The construction which we give to the Code must operate as a general rule, applicable to all cases as to the legal effect of granting permanent alimony out of the husband's estate, where a total divorce is granted. It is quite probable it was the intention of the Legislature, in restricting the wife to permanent alimony for *her support* during life out of her husband's estate, not to offer any inducement for husband and wife to dissolve the marriage contract from merely mercenary motives as to property. The legal effect of the verdict rendered by the jury in this case, under the provisions of the Code, is to vest the amount found by them in the plaintiff as permanent alimony during her life only for her *maintenance* and *support,* according to her rank and condition in life.

Let the judgment of the Court below be affirmed.