## Lou A. Friend v. John Friend.

*Divorce—Estoppel—Extreme cruelty—Dower.*

1. A party to a divorce suit is not estopped as to the main issue by a decree entered by his own procurement, since collusive divorces are unlawful.

2. It is extreme cruelty to turn a wife and her daughter out of doors without cause, and to make their separation the condition of taking the wife back again.

3. A woman who obtains a divorce cannot be deprived, without her consent, of her dower right.

Appeal from Kent. (Russell, J.)  April 22–3.—April 30.

Divorce bill.  Both parties appeal.  Affirmed.

*C. C. Howell* for complainant.  Conduct which results in driving a wife from home is cruelty : *Briggs v. Briggs* 20 Mich. 34; *Burr v. Burr* 7 Hill 207.

*Wm. O. Webster* for defendant.  One is not obliged to support a step-child : *Tubb v. Harrison* 4 Term 118 ; *Cooper v. Martin* 4 East 76 ; *Freto v. Brown* 4 Mass. 675 ; *Com. v. Hamilton* 6 Mass. 273 ; *Worcester v. Marchant* 14 Pick. 510 ; *Brookfield v. Warren* 128 Mass. 287 ; *Gay v. Ballou* 4 Wend. 403 ; *Williams v. Hutchinson* 3 N. Y. 317.

Campbell, J.  Complainant obtained a divorce from defendant for cruelty, and was granted seven hundred dollars alimony absolutely, and six hundred more in case she should release her dower,—these amounts to be paid in one, two, three and four years, with interest after one year. Defendant appealed generally, and complainant appealed for insufficient alimony.

Complainant, when she married defendant in November, 1876, was doing a fairly prosperous business as a hair-dresser, and had one daughter, named Jennie Farrell, about ten years old.  She had no property beyond her business, which was chiefly made available by her personal exertions.  Defendant at

this time was a widower who had been married more than once, and had several grown up children living near him, and three daughters at home of the ages respectively of fifteen, ten and five years. He lived on a farm adjoining Sebewa corners in Ionia county, where he was also engaged in mercantile business. He owned other lands near by.

The bill was filed in June, 1880, and complainant by her counsel took testimony and made out her case. By some clandestine arrangement between defendant and her counsel, they without her knowledge or procurement got a decree of divorce with a small amount of alimony, to the extent of $400, with ordinary costs. This decree was made in November, 1880. He had previously offered $500 as a compromise, but complainant declined making any consent arrangement. When she learned of this decree she filed a bill to rescind it for the fraud, and it was rescinded. Both parties afterwards proceeded with proofs, which are very bulky, the complainant having put her case in the hands of new solicitors, and the cause having been transferred to Kent county for disposal.

If divorce cases stood on the same footing with all other cases, we should feel bound to consider defendant as estopped by the decree entered in the first instance by his procurement, so far as the main issue is concerned. But our laws forbid all collusive divorces, and require each case to stand on its proper equities. We must therefore examine into the facts. It is proper to say that complainant has not sought to get any advantage from the old decree which she repudiated as fraudulent, and has invited a hearing on all the merits. ·

The case presents some difficulties concerning a part of the facts, and is supposed by counsel for defendant to raise some legal difficulties also. We shall therefore be obliged to make reference to the general nature of the controversy, but we do not think it desirable to perpetuate by narration the unfortunate details of family strife, beyond the actual necessities of decision. They arose in considerable measure from the complications of families not having the same common ties. While there was some disparity of age, it had no apparent effect on the relations of the parties except through the divers-

ity of children. No children were the result of complainant's marriage with defendant. But complainant's young daughter became one of the means of cruelty, if there was cruelty, by which defendant compelled her to seek legal redress.

Upon her marriage complainant gave up her business, and she and her daughter went into the family, consisting generally of these parties and defendant's three daughters before mentioned. The older married children formed no part of the permanent household.

The grievances which complainant relies on are alleged as consisting chiefly in various forms of domestic tyranny, and more particularly in wounding her feelings by insulting and injurious charges and insinuations against her chastity. But the final and principal ground of complaint was the forcible and violent expulsion of complainant and her daughter from defendant's house.

Upon the hearing defendant's counsel very fully vindicated complainant from any imputations of impropriety, and insisted not only that defendant acquitted her of misconduct but had never charged her with it, and had always been and still continued desirous of her return. It is therefore hardly necessary to say that her character appears free from any such stain. But in his answer, he defends not only by making counter-charges of many neglects of duty and acts of ugliness, but by insinuations which are quite as offensive as direct charges of unchaste conduct. The answer is in such a tone as very conclusively negatives any desire for conciliation, or any real affection. And we cannot but feel that it is somewhat corroborative of complainant's charges as to defendant's temper and conduct, as hard and vindictive. The witnesses to the larger part of the home transactions are necessarily such as to have considerable bias, and it becomes necessary to infer the real meaning of ambiguous facts by looking somewhat at results and consequences.

If we had nothing before us but the testimony concerning a large part of the sayings and doings in the family, we could not with any assurance conclude that such discords as appeared reached such a degree as to make the marriage relation

any more intolerable than is found in many uncomfortable households, where it would be entirely wrong to break them up. Taking a good share of these by themselves, it could be believed that the case was the not uncommon one where a new wife, of a somewhat nervous temperament and not very robust constitution, is brought into a home where the husband is set, and not very sympathetic, and the children, though not vicious, have no filial attachment to her. It is evident that she was impulsive and not careful in her speech, and frequently hasty and more or less provoking in her conduct. Much that is shown to have been said and done by both was evidently not meant on either side to be seriously offensive, and a good deal of it on both sides was very much wanting in delicacy and refinement. But defendant indicated much less sensitiveness of feeling, and his retorts and insinuations do not seem to have been, as .generally as hers were, the outcome of haste or impetuosity, and were sometimes intentionally aggravating. It is impossible to read the record without a conviction that defendant has an obstinate and imperious .and domineering disposition which has borne upon her very heavily and made her feel her subjection very unpleasantly, and that he has meant to drive her into thorough submission. The methods of bearing down on those who are subject to such domination do not. usually furnish means of appreciation except in the aggregate results, and courts find it difficult to fully comprehend the true condition of things. But when we look at the evident condition of the family relations towards the last, and consider, what cannot be entirely ignored, how it affected the conclusions of those who were observers, we are convinced that he is responsible for a very serious mischief. The overt acts which are specified as the immediate cause of the separation were his driving complainant's daughter out of the house without any reasonable cause, and with the evident purpose, not only of injuring her, but of cowing and grieving complainant. Having insisted that complainant should put her daughter somewhere else, and actually sent her from the house, he not only locked the doors on complainant and her

child, but kept them out till a late hour in the night, and at last compelled them to sleep in an unusual room without letting them have their night apparel, and before admitting them at all used insulting and brutal language towards his wife. The next morning, when they were in the house, and complainant was engaged in household duties, he put both of them forcibly out of doors, and subsequently threatened the daughter if she should ever darken his doors again, and ordered his wife to come back into the house. She, upon this, left and never returned. He afterwards offered to take back his wife, but only on condition of separating from her daughter.

It is difficult to imagine any worse cruelty to a mother than such conduct, if not explained or excused. The only explanation that is given is that by law a husband is not bound to support step-children. Such a rule, if applicable, is no excuse for personal violence and indecent abuse, and it could not palliate any cruelty which was resorted to from vindictiveness. But we do not think it has any place in this controversy. And we are not required on this record to consider what the law is on that general subject.

Complainant was dependent on her own labor and exertions for the support of herself and child, and she had no difficulty in securing it. Defendant knew that this was the case, and he must have known that none but an unnatural mother would desert her young daughter to become his wife, and that if she had any suspicion that he desired such a result she never would have married him. He has introduced some testimony to show that just after the ceremony she applied to him for leave to bring her daughter with her, and that he kept a diplomatic silence. If this is true, it is one of the most disgraceful evidences of his character in the whole record. But, to his credit, we do not believe it. The child was at once made a member of the family, and it was only during the latter days of discord that her condition was questioned. It was one of the expedients to break the mother's rebellious spirit, which, as we cannot but think, was the resort of disappointed obstinacy to compel submission to

a very determined will. We are unwilling to believe that defendant has been actuated by any mere calculating malice. The record does not satisfy us that they would not have been reasonably harmonious if she had been always and unqualifiedly submissive. But we see no great signs of any more willfulness or self-assertion in her than any sensible person might view with indulgence and accommodate by kindness. The discords grew up gradually. But in their latter stages and in their results, we think that defendant has been guilty of very great cruelty, and that his willingness, if it existed, which we very much doubt, to get his wife back, and leave her daughter out of doors, is no indication to the contrary. He has made it impossible to imagine that they can ever live together, without some such radical change as we have no reason to hope for.

We think the divorce should be affirmed. The question of alimony becomes material. In considering it some regard must be paid to the defendant's family necessities and surroundings. The expense and delay of the appellate proceedings make it necessary to make an additional allowance for legal expenses, and we think $150 should be allowed to be added to the $300 given by the court below. A much larger allowance is asked for by counsel, but we think that the circuit judge probably considered the matter fully, and we see no adequate reason for making any change in his estimate for services below. We presume the defendant has paid the expenses for testimony and other taxable costs. If not, he must do so, and the order may be in form for the payment of the taxable costs, in addition to this allowance of $300 below and $150 here.

We think the alimony allowed absolutely should be increased from $700 to $1000, of which $200 must be paid within sixty days, and the remainder in two annual installments. As her dower is a right of which we cannot deprive her, we shall not disturb the decree on that subject.

The decree below will be affirmed, subject to these modifications.

The other Justices concurred.